**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSHUA WOODARD, NEIL WESTFALL, ALEX SHELNUTT, JEREMY McKINNON,** all professionally known as **A DAY TO REMEMBER,** | ) ) ) ) | |
| | ) | **Case No. 11-cv-7594** |
| **Plaintiffs,** | ) ) | **Honorable John Z. Lee** |
| **v.** | ) ) | |
| **VICTORY RECORDS, INC. and ANOTHER VICTORY, INC.,** | ) ) ) | |
| **Defendants.** | ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Defendants Victory Records, Inc. and Another Victory, Inc. ("Victory") seek to preclude Plaintiffs Joshua Woodard, Neil Westfall, Alex Shelnutt, and Jeremy McKinnon, members of the rock band, A Day to Remember (collectively "ADTR"), from releasing a new album on Tuesday, October 8, 2013. Victory contends that ADTR is precluded from releasing the album because it has not yet satisfied its obligations under a recording contract that requires ADTR to release five albums under the Victory label. In response, ADTR argues that it has delivered more than the five required albums to Victory and should not be precluded from releasing its new album independently. Although the ultimate issue of whether ADTR has satisfied its obligations to Victory under the recording contract is yet to be determined, Victory asks the Court to impose the extraordinary remedy of injunctive relief to preclude ADTR from releasing the album during the pendency of this case. For the reasons set forth herein, the Court concludes that such an extreme remedy is not appropriate based upon the record before it, and Victory's motion is denied.

**Factual Background**

On July 17, 2006, ADTR entered into a recording contract (the "Deal Memo") with Victory.  Pursuant to the terms of the Deal Memo, ADTR was to deliver five "Albums" to Victory for release.  ADTR now seeks to extricate itself from its business relationship with Victory, contending that it has delivered "at least thirteen (13) Albums, as that term is defined in the Deal Memo" to Victory, thereby fulfilling its obligations under the terms of the contract.  (2d Am. Compl. ¶¶ 8-9.)  ADTR further alleges that Victory has engaged in certain unacceptable conduct, including, *inter alia*, attempting to copyright ADTR compositions to which Victory has no rights, failing to pay ADTR certain royalties, and improperly holding certain funds in reserve. (*Id.* ¶¶ 20-21.)  Victory denies ADTR's assertions, denies that ADTR has satisfied its end of the bargain, and asserts counterclaims against ADTR for breaching the terms of the agreement.

ADTR has now informed Victory and the Court that it intends to independently release an album of new music entitled *Common Courtesy* on Tuesday, October 8, 2013.  (Opp. Mot. Prelim. Inj. 1.)  Victory objects and asks the Court to issue a preliminary injunction prohibiting ADTR from self-releasing the new album until the case can be resolved.  (Defs.' Mem. Supp. Mot. Prelim. Inj. 1; Defs.' Reply Supp. Mot. Prelim. Inj. 2.)

**Discussion**

**A.    Standard of Review**

A preliminary injunction is an extraordinary remedy that is "never to be indulged in except in a case clearly demanding it."  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the USA, Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (internal citations and quotations omitted).  The party seeking a preliminary injunction must clearly demonstrate that it is entitled to the relief it seeks.  *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005).

In order to make this showing, the movant must demonstrate as a threshold matter that (a) it will suffer irreparable harm without the injunction; (b) traditional legal remedies would be inadequate to remedy the harm; and (c) its claim has some likelihood of success on the merits. *Girl Scouts*, 549 F.3d at 1086. If the movant fails to establish these requirements, "a court's inquiry is over and the injunction must be denied." *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 703 (7th Cir. 2005) (internal citations and quotations omitted). On the other hand, if all three requirements are satisfied, the movant also must demonstrate that its harm in the absence of such relief outweighs any harm that may be suffered by the non-moving party if the injunction is granted. *Girl Scouts*, 549 F.3d at 1086.

In conducting this balancing of interests, the Court will use a sliding scale approach: "'[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor, the less likely he is to win, the more need it weigh in his favor.'" *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984)). Additionally, where appropriate, this balancing process "should . . . encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the "public interest")." *Id.* (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).

Once it takes into account all of these considerations, the Court exercises its discretion "to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id.* (internal citations and quotations omitted).

**B.      Likelihood of Success on the Merits**

In order to obtain a preliminary injunction, Victory must establish that it has some likelihood of succeeding on the merits of its claims.  *See Girl Scouts*, 549 F.3d at 1096.  This is not a high burden.  Generally a movant satisfies this element so long as it demonstrates a "'better than negligible' chance of succeeding on the merits."  *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 824 (7th Cir. 1998) (internal citations omitted).  Based on the current record in the case, the Court concludes that Victory has a "better than negligible" chance of prevailing on the merits.

Here, the core dispute between the parties hinges on the definition of "Album" under the terms of the Deal Memo.  The Deal Memo provides that "[a]n Album is a [sic] of reproduction, transmission or communication of Recordings, now or hereafter known, manufactured, distributed, transmitted or communicated in any format."  (2d Am. Compl. at Ex. A, p. 1.)  According to ADTR, this definition of "Album" is "unambiguous and should be enforced as written."  (Pl.' Mem. Supp. Mot. Summ. J. 21.)  Using this definition, ADTR argues that all thirteen of its recordings released by Victory were "Albums," including re-releases of previously released collections of songs with certain "bonus tracks" and a recording of a single song in two versions. (*Id.*)

For its part, Victory argues that Album "could only mean new studio or 'commitment' albums that are delivered in accordance with" the eighteen and twenty-four month cycle "that is the recognized custom and practice of the music recording industry."  (Defs.' Opp. Mot. Summ. J. 24.)   Accordingly, by Victory's count, ADTR has delivered only three of the five Albums required under the Deal Memo and is obligated to provide two more.

When denying ADTR's motion for summary judgment, the Court found that the term "Album" is internally ambiguous for a number of reasons. This has not changed. First, the definition in the Deal Memo itself is vague and may have more than one reasonable construction. Indeed, taking the definition literally, ADTR could fulfill its obligations under the Deal Memo by delivering to Victory five copies of the exact same collection of songs. This could hardly be what the parties intended when entering into the Deal Memo. Moreover, the broad definition urged by ADTR is inconsistent with other provisions in the Deal Memo, including but not limited to the provisions outlining the schedule of royalty payments, publishing advances, and recording advances by Victory to ADTR.

This is not to say that the narrow definition offered by Victory will ultimately prevail. A number of factual issues remain. For example, whether the two live recordings made by the band and released by Victory constitute separate "Albums" as that term appears in the Deal Memo remains an open question. That said, for the purpose of deciding this motion, it is sufficient for the Court to find that, as between the overly broad definition offered by ADTR and the narrow one offered by Victory, the record currently before the Court supports Victory's construction at least as equally, if not more so, than that offered by ADTR. Accordingly, the Court finds that Victory has a "better than negligible" chance of prevailing in this litigation.

## C.  Irreparable Harm and Adequacy of Remedy At Law

The Court's inquiry, however, does not end there. Victory also must demonstrate that it will suffer irreparable harm without the relief it seeks. *Girl Scouts*, 549 F.3d at 1087. To establish irreparable harm, Victory must show "that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). The threat of irreparable injury necessary to justify the extraordinary remedy of

preliminary injunctive relief must be "real and "immediate," not "conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). In addition, Victory must demonstrate that traditional legal remedies, such as monetary damages, would be inadequate to remedy the harm it would suffer absent an injunction. *Girl Scouts*, 549 F.3d at 1095. *See Kreg Therapeutics, Inc. v. VitalGo, Inc.*, No. 11 CV 6771, 2011 WL 5325545, at * 5 (N.D. Ill. Nov. 3, 2011) ("An injury is 'irreparable' when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard."). The inquiries into the existence of irreparable harm and the availability of an adequate remedy at law often raise similar issues and are frequently conducted in combination with one another. *See Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997).

As an initial matter, Victory claims that "irreparable harm is presumed in instances such as this where Victory alleges that the threatened release by ADTR will result in copyright infringement." (Mem. Supp. Mot. Prelim. Inj. 6 (citing *Atari Inc. v. N. Am. Philips Consumer Elec. Corp.*, 672 F.2d 607, 620 (7th Cir. 1982))); Reply Supp. Mot. Prelim. Inj. 15 (same)). This is a bald misstatement of the governing law. The Seventh Circuit has repudiated the notion that irreparable harm is to be presumed in a copyright infringement case. *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012).

In *Flava Works*, a video producer brought a copyright infringement action against an online bookmarking service that allowed users to find and bookmark videos online to share with other users. The video producer moved to enjoin the defendant from providing this service, alleging that it constituted a form of contributory infringement of its copyrights. Relying on *Atari*, the district court granted the motion for injunctive relief, finding that Flava Works had a likelihood of success on the merits and that "irreparable injury may normally be presumed from

a showing of copyright infringement." *Id.* But on appeal the Seventh Circuit emphasized that the Supreme Court has done away with the presumption of irreparable harm for patent cases and found the reasoning equally applicable to copyright infringement actions. *Id.* (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006)). Thus, *Atari* is no longer governing law as to this point and should not have been relied upon (twice) by Victory.

That being said, assuming, *arguendo*, that ADTR owes Victory two more Albums under the Deal Memo, Victory also contends that it would suffer irreparable harm absent injunctive relief because any lost profit resulting from the release of *Common Courtesy* would be too difficult to ascertain, thereby precluding a satisfactory remedy at law. But this argument is unpersuasive for a number of reasons. First, this is not a case involving a new, unknown entity or novel business venture. ADTR is an established band with a track record of financially successful albums. To the extent that *Common Courtesy* generates profits and results in increased revenue to the band, those amounts will be readily ascertainable by Victory through discovery in this case.

Victory nevertheless contends that money damages will not be calculable because a record label, like Victory, typically contributes much to the creation, marketing and distribution of a new record to ensure its commercial success -- opportunities that it did not have here. The gist of Victory's argument is that relying solely upon the actual financial performance of *Common Courtesy* after its release by ADTR will not provide a reasonable estimation of damages to Victory, because the profits would have been much higher if Victory had been able to participate in the record's creation, marketing and distribution. But this then leads us to the second point.

7

Regardless of how "Album" is defined in the Deal Memo, it is undisputed that ADTR has released, at a minimum, three Albums (*For Those Who Have Heart*, *Homesick*, and *What Separates Me From You*) through Victory, all of which have been financially successful. Not only does Victory have the information regarding the financial performance of these Albums in its possession, but it presumably was involved in the creation, marketing, and distribution of those Albums. Accordingly, the sales and profit information from those records provide additional data from which Victory can estimate the profits that it would have made had it been given the opportunity to oversee the release of *Common Courtesy*. In this way, the facts of this case are distinguishable from the decisions upon which Victory relies. *See Mintel Int'l Grp., Ltd. v. Neergheen*, No. 08-cv-3939, 2008 WL 2782818, at *5 (N.D. Ill. Jul. 16, 2008) (finding no adequate remedy at law where salesperson improperly took client account files including budgets and costs data, clients lists, vendor lists, and marketing strategies and that it was difficult to ascertain how the confidential information would be used and what harm would result from such use); *Gordy Co. v. Mary Jane Girls, Inc.*, Nos. 86 CIV 6814, 87 CIV 3438, 1989 WL 149290, at *23 (S.D.N.Y. Dec. 6, 1989) (lost profits unavailable where they were based solely on "conclusory allegations about the prospects of the artists' work").

Victory also claims that it will suffer irreparable harm because the product is a unique piece of intellectual property, citing *Lower Cook County Mobil Dealers' Ass'n v. Exxon Mobil Corp,* No. 06 C 3652, 2006 WL 3590080, at *2 (N.D. Ill. Dec. 8, 2006). But the decision in that case rested on the well-worn adage that "real property is always considered unique" and hence is distinguishable. *Id.* at *2. Furthermore, although it is true that some courts have issued negative preliminary injunctions in cases involving unique products or services, the exclusivity agreement in those cases typically contained a set term or expiration period, which circumscribes the burden

of the restriction upon the enjoined party. *See, e.g.*, *Madison Square Garden Boxing, Inc. v. Shavers*, 434 F. Supp. 449, 452 (S.D.N.Y. 1977) (granting negative injunction preventing a boxer from fighting in competing match where contract was for a fixed duration and contained an enforceable restrictive covenant); *Am. Broad. Co., Inc. v. Wolf*, 420 N.E.2d 363, 367-68 (N.Y. 1981) (explaining that "cases permitted injunctive relief where the circumstances justified implication of a negative covenant . . . because the employee either expressly or by clear implication agreed not to work elsewhere *for the period of his contract*") (citations omitted and emphasis added); *Zomba Recording LLC v. Williams*, 839 N.Y.S. 2d 438 (N.Y. App. Div. 2007) (temporary injunctive relief appropriate where agreement was for definite period of time and contained an enforceable restrictive covenant). Such a measured approach is consistent with Illinois' policy to enforce restrictive covenants only where they are reasonable in scope and duration. *See, e.g., Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85, 98 (Ill. 2006) ("[T]his court has a long tradition of upholding covenants not to compete in employment contracts involving the performance of professional services when the limitations as to time and territory are not unreasonable."). The Deal Memo contains no such limitation. *See*, *e.g.*, *Curb Records, Inc. v. McGraw*, No. M2011-02762, 2012 WL 4377817, at *6 (Tenn. Ct. App. Feb. 12, 2013) (denying injunctive relief where singer Tim McGraw's recording contract with plaintiff did not contain a "specific durational limit").

Finally, Victory argues that if ADTR is allowed to self-release its album, Victory may suffer irreparable harm to its reputation because the record may "be of substandard quality or even of lesser quality than the prior Victory releases." (Mem. Supp. Mot. Prelim. Inj. 10.) But Victory offers no evidence to support this proposition, and the cases upon which Victory relies all involve products that were demonstrably inferior in quality. *See*, *e.g.*, *Firma Melodiya v. ZYX*

9

*Music GmbH*, 882 F. Supp. 1306, 1315 (S.D.N.Y. 1995) (substandard quality compact discs); *Saban Entertainment, Inc. v. 222 World Corp.*, 865 F. Supp. 1047, 1056-57 (S.D.N.Y. 1994) (trademarks infringed by knock-off toys); *RCA Records v. All-Fast Systems, Inc.*, 594 F. Supp. 335, 338 (S.D.N.Y. 1984) (copyrights infringed by poorly-mastered tape recordings).

Furthermore, the Court notes that ADTR is an established band with numerous recordings under its belt, an experienced management team, and a substantial fan base. It is difficult to believe, in the absence of contrary evidence, that ADTR would release an album that is materially inferior in recording quality to its prior records, even if it is "self-released." Indeed, in this age of digital music distribution through internet channels such as YouTube or iTunes, it can hardly be presumed that a "self-released" recording by a music artist would be "inferior" in terms of recording quality to one overseen by an established record company. Finally, ADTR has made it explicitly clear that it is releasing the record on its own, without the assistance or participation of Victory. As such, even assuming that *Common Courtesy* will be substandard in recording quality, any blame would likely fall upon ADTR, rather than Victory, and the value of Victory's contributions to its artists may become manifest and even enhanced. Therefore, Victory's "reputational" arguments fall short of establishing irreparable harm.

**D.    Balancing of harms**

Although the Court need not undertake a balancing analysis in light of Victory's failure to satisfy all three threshold requirements, *see E. St. Louis Laborers' Local*, 414 F.3d at 703, the Court does so for the sake of completeness and concludes that, on balance, the harm to ADTR in the event that a preliminary injunction were to issue is greater than the harm that Victory would suffer in the absence of such injunctive relief. As noted above, Victory has an adequate remedy at law if ADTR is permitted to release its new record. Victory will be able to seek the lost

profits from the sale of *Common Courtesy* based upon information gained from the sales of ADTR's prior three Albums and the sales of *Common Courtesy* itself. Furthermore, in the event that Victory prevails in this action, it will undoubtedly seek to hold ADTR to its obligation to deliver two additional Albums to Victory pursuant to the terms of the Deal Memo. (*See* Defs.' Countercls. ¶ 49.)

In contrast, ADTR has not released a collection of new songs in quite some time. (Mem. Opp. Mot. Prelim. Inj. 7; Mercado Decl. ¶ 25.) As a pop band in a very competitive and fickle marketplace, it is likely that ADTR will experience a material erosion in popularity and fan support if it is prohibited from releasing a new record until the resolution of this case, which is likely many months away. (Mercado Decl. ¶¶ 26, 27; Childress Decl. ¶ 9.) *See also Curb*, 2012 WL 4377817 at *4 ("an injunction would likely have an adverse and disproportionate effect on the body of musical recording work Mr. McGraw would be permitted to produce during this important period in Mr. McGraw's musical career."). This will not only harm ADTR, but also would detrimentally impact Victory's ability to benefit from ADTR's continued popularity in the event that it prevails in this action. Accordingly, the Court concludes that the balancing of harms favors ADTR, particularly in light of the very slight margin by which Victory is likely to succeed on the merits of its claims.

**Conclusion**

For the reasons set forth above, Defendants/Counter-Plaintiffs Victory Records, Inc. and Another Victory, Inc.'s Motion for Preliminary Injunction (dkt. 192) is denied.

**SO ORDERED**                                    **ENTER:**

_____
**JOHN Z. LEE**
**U.S. District Judge**

October 4, 2013