**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSHUA WOODARD, NEIL WESTFALL, ALEX SHELNUTT, and JEREMY MCKINNON, all professionally known as A DAY TO REMEMBER,** | ) ) ) ) ) ) | **No. 11 CV 7594** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Magistrate Judge Young B. Kim** |
| **VICTORY RECORDS, INC. and ANOTHER VICTORY, INC.,** | ) ) ) ) | **November 7, 2013** |
| **Defendants.** | ) | |

**MEMORANDUM OPINION and ORDER**

Before the court is Defendants' motion for an order declaring certain emails unprotected by the attorney-client privilege. Although Defendants bring their motion, titled "Defendants' Motion for Order of Waiver of Privilege," pursuant to Federal Rule of Evidence 502(b), this rule is not applicable to the emails in dispute. Rule 502(b) would require an analysis of whether Plaintiffs waived their attorney-client privilege by their inadvertent disclosure of the emails in question, not whether they are entitled to assert the privilege in the first place. However, Defendants' argument here is that the emails in question are not protected by the attorney-client privilege because they were not confidential communications. With this clarification, and for the reasons that follow, Defendants' motion is granted in part and denied in:

## Background

Plaintiffs Joshua Woodard, Neil Westfall, Alex Shelnutt, and Jeremy McKinnon are four members of a musical band called "A Day to Remember" (the "Band"). A fifth member of the Band, Kevin Skaff, is not part of this lawsuit. The Band has two managers, Mark Mercado and John Youngman, who are principals of Fly South Music Group, LLC, a management company. Also currently involved with the Band, or involved with the Band during relevant time periods, are financial advisor Jason Childress, business manager Noel Hartough, and several attorneys, including Nick Ferrara, Mike McKoy, Jay Bowen, Will Parsons, Danny Hayes, Jeff Leven, and Brian McClain.

Defendant Another Victory, Inc. is a music publisher. Defendant Victory Records, Inc. ("Victory") is a record company with whom the Band has signed a "Deal Memo," the terms of which are at the core of this litigation. The president of Victory is Tony Brummel.

In July 2012, Plaintiffs produced a large number of documents to Defendants in discovery. (R. 189, Aug. 22, 2013 Mem. Op. and Ord. at 1.) Not included in the original production were emails bearing the Bates stamp numbers ADTR 1433 through ADTR 1475 (the "emails").[1] (Id. at 1-2.) According to Plaintiffs, the emails were segregated and withheld from their document production on the basis that the

---

[1] Plaintiffs omitted documents ADTR 1388 through ADTR 1475 from their production, but only ADTR 1433-75 are in dispute.

work-product doctrine[2] and attorney-client privilege protected them from disclosure. (Id. at 2.)  The gap in sequencing caught the eye of counsel for Defendants, Robert Meloni, who asked counsel for Plaintiffs, Will Parsons, about the missing documents.  (Id.)  Parsons was out of town on that date, so he asked his legal assistant to email him the documents sought by Meloni.  (Id.)  The legal assistant did so, but she erroneously emailed the documents to both Parsons and Meloni. (Id.)  Parsons discovered this inadvertent disclosure a few days later, (id.), and accordingly sent Meloni a letter asking him to destroy all copies of the emails pursuant to Federal Rule of Civil Procedure 26(b)(5)(B).  (Id.)

Nothing happened with the emails until the July 2013 deposition of Manager Mercado, at which time Meloni asked Mercado questions based on these disputed emails.  (Id.)  Parsons objected to the use of the emails pursuant to Rule 26(b)(5)(B). (Id.)  Thereafter, the parties began in earnest to dispute the asserted privilege and Defendants' right to use the emails in depositions and for other purposes related to the litigation.  (Id.)  Plaintiffs filed a motion seeking to prohibit Defendants from using the emails.  (R. 170.)  This court granted the motion to the extent that it ordered Defendants to:  (1) sequester or destroy the emails; (2) refrain from using the emails until they are deemed not privileged or no longer privileged; (3) treat those portions of Mercado's deposition testimony pertaining to the emails as confidential and privileged information until further order of the court or agreement of the parties; (4) refrain from using or referring to the emails during John Janick's

---

[2]  Plaintiffs do not assert that the emails in question fall within the protection of the work-product doctrine.

3

deposition if they wish to proceed with his deposition prior to a resolution of the privilege issue; (5) take reasonable steps to retrieve the emails if they disclosed any of the pages to others; and (6) verify in writing to Plaintiffs that they have complied with the court's order.

Defendants now seek a ruling that the emails in dispute are not protected by the attorney-client privilege because they were circulated to a third party—John Janick. Plaintiffs counter that the emails are privileged communications among the members of the Band, its agents (a group that, according to them, includes Janick), and their attorneys and that they "specifically discuss the legal obligations of the Band under its agreement with Victory Records, and various legal options based on that agreement, and directly and indirectly reveal client confidences concerning [the Band's] relationship with and contractual obligations to Victory Records." (R. 249, Pls.' Resp. at 4.)

## Analysis

### A.    Applicable Federal Rules

As discussed in this court's earlier ruling, (R. 189), Rule 26(b)(5)(B) governs how parties shall behave in the aftermath of an unintended disclosure of materials claimed to be privileged. Rule 26 permits parties to "clawback" inadvertently disclosed documents they believe are subject to a claim of privilege and to prevent the receiving party from using them until the privilege claim is resolved. *See* Fed. R. Civ. P. 26(b)(5)(B). In contrast, Federal Rule of Evidence 502(b) addresses the issue of whether inadvertent disclosure of privileged documents—meaning

documents not subject to a privilege dispute—operates as a waiver of privilege. Sandwiched in between these two rules is the threshold question of whether the inadvertently disclosed emails in this case are in fact privileged.  If no privilege is found, then Rule 502(b) is simply inapplicable.  *See Heriot v. Byrne*, 257 F.R.D. 645, 655 (N.D. Ill. 2009) (finding that "[p]rior to addressing any of the elements stated in FRE 502(b) . . . the court must determine whether the documents are privileged"). Conversely, if the emails are deemed privileged, then Rule 502(b) requires the court to analyze whether Plaintiffs took adequate steps to cure the disclosure so as to stave off a waiver of that privilege.  For this reason, Defendants' contention that they are moving pursuant to Rule 502(b) for a ruling that the emails are not privileged is incorrect.  However, the court is not bound by the title of their motion and will address the substance of the parties' dispute, which is whether the emails are in fact privileged.

Furthermore, although Defendants assert that Janick's presence in the email chain acted as a waiver of the attorney-client privilege, the court finds that Janick's presence is relevant to the question of confidentiality, not waiver.  The distinction is important:  "waiver" in this context assumes the existence of a privilege that was then allowed, perhaps inadvertently, to be relinquished.  *See, e.g., Hahn v. County of Kane*, 2013 IL App 120660, 991 N.E.2d 373, 378-79 (2d Dist. 2013) (defining waiver and implied waiver); *Center Partners, Ltd. v. Growth Head GP, LLC*, 2012 IL 113107, 981 N.E.2d 345, 356 (Ill. 2012) (noting that one of the exceptions to the attorney-client privilege is the concept of waiver, which can occur, for instance,

when a party voluntarily testifies about a privileged matter or otherwise discloses privileged information). By way of contrast, "confidentiality" in this context involves the question of whether, during a legal communication between a client and attorney, a third party's involvement prevents the privilege from attaching in the first place. *See Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill.2d 103, 113 (1982) (holding that to avail itself of the attorney-client privilege, a claimant must show, among other things, that the communication remained confidential).

## B.     The Attorney-Client Privilege

The attorney-client privilege extends to confidential communications between a client and attorney made "in order to obtain legal assistance." *Fisher v. United States,* 425 U.S. 391, 403 (1976). Because this court is sitting in diversity as to the parties' claims, state law applies to the question of whether the emails at issue are protected by the attorney-client privilege. *See Favala v. Cumberland Eng'g Co., a Div. of John Brown Inc.*, 17 F.3d 987, 989 (7th Cir. 1994). This point is not in dispute.

Under Illinois law, the party asserting the attorney-client privilege bears the burden of showing its applicability. *Stopka v. American Family Mut. Ins. Co., Inc.*, 816 F.Supp.2d 516, 523 (N.D. Ill. 2011). To meet this burden, the party must prove that "the statement originated in a confidence that it would not be disclosed, was made to an attorney acting in his legal capacity for the purpose of securing legal advice or services, and remained confidential." *Equity Residential v. Kendall Risk Mgt., Inc.,* 246 F.R.D. 557, 563 (N.D. Ill. 2007) (citations omitted). The Illinois

6

Supreme Court has established the following test to be demonstrated by the party asserting the privilege: "(1) where legal advice of any kind is sought, (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are permanently protected, (7) from disclosure by himself or the legal advisor, (8) except the protection be waived." *Illinois Educ. Ass'n v. Illinois State Bd. of Educ.,* 204 Ill.2d 456, 467 (2003). The protection extends to communications flowing from the client to the attorney, as well as to advice flowing from the attorney to the client. *Midwesco-Paschen Joint Venture for Viking Projects v. Imo Indus., Inc.,* 265 Ill.App.3d 654, 661 (1st Dist. 1994). However, the Illinois Supreme Court has made clear that the privilege is to be construed as narrowly as possible, with "a strong policy of encouraging disclosure." *Waste Mgt., Inc. v. International Surplus Lines Ins. Co.,* 144 Ill.2d 178, 190 (1991). Accordingly, "[t]he mere passing of information between client and attorney is not sufficient to invoke the privilege." *People v. Harris,* 211 Ill.App.3d 670, 675 (1st Dist. 1991). Furthermore, the attorney-client privilege does not apply to communications involving business advice instead of legal advice. *CNR Invs., Inc. v. Jefferson Trust and Sav. Bank of Peoria,* 115 Ill.App.3d 1071, 1076 (3d Dist. 1983).

As a consequence of Plaintiffs' invocation of Rule 26(b)(5)(B), it became Defendants' obligation to challenge Plaintiffs' claim of privilege. Now that Defendants have finally done so, the burden shifts to Plaintiffs to demonstrate the elements of the privilege they claim applies to each of the emails at issue. *See Cox*

*v. Yellow Cab Co.*, 61 Ill.2d 416, 417 (1975). Both parties chose not to address the issue of whether the emails involve communications of a legal nature. Defendants do lay out the elements of the attorney-client privilege, but they assert, without adequate development or elaboration, that the emails involve a discussion of financial matters and that Plaintiffs bear the burden of proving otherwise. (R. 207, Defs.' Mot. at 12.) Defendants then turn their focus, more or less exclusively, to whether Janick's presence destroyed the confidential nature of the communications—step four of the eight-part test. Plaintiffs interpret Defendants' focus as a concession regarding all but step four of the attorney-client privilege test, (R. 249, Pls.' Resp. at 4), and, content in this belief, likewise focus their analysis on explaining why Janick's presence did not destroy the confidential nature of their communications with their attorneys. (Id. at 5-9.) Accordingly, the court likewise focuses its attention on whether Janick's inclusion and access to the emails destroyed the requisite confidentiality. There are two notable exceptions, however: ADTR 1449 and 1450. Neither of these emails involves Janick and thus do not implicate confidentiality concerns. ADTR 1449 is an email from Manager Mercado to Attorney Ferrara, while ADTR 1450 is an email from Mercado to Ferrara, Manager Youngman, Business Manager Hartough, Financial Advisor Childress and Attorney McCoy. Based on this court's review, these two emails reflect inquiries from Mercado to the Band's attorneys and uncontested agents seeking legal advice. As such, these emails, ADTR 1449-1450, are protected by the attorney-client privilege.

8

## C.    Confidentiality Requirement

The attorney-client privilege only shields communications between a lawyer and a client that were intended to be confidential.  A breach of this confidentiality through disclosure to a third party can prevent the privilege from attaching.  *See People v. Doss*, 161 Ill.App.3d 258, 261 (4th Dist. 1987) ("Ordinarily the presence of a third person indicates a lack of intention that the communications of a client to his attorney are meant to be confidential and the privilege does not apply.").  An exception to this general rule, however, is when the third party is an agent of the client.  *Id.*; *see also Stopka*, 816 F.Supp.2d at 529; *Ill. Sup. Ct. R.* 201(b)(2).[3]  "An agent is one who, acting under authority from another, transacts business for him, and a true agency requires that the agent's function be the carrying out of the principal's affairs."  *Lang v. Consumers Ins. Serv., Inc.*, 222 Ill.App.3d 226, 232 (2d Dist. 1991).  Another aspect of this relationship is that the principal has the right to control how the agent performs his work, and the agent has the ability to expose the principal to liability.  *Lang v. Silva,* 306 Ill.App.3d 960, 972 (1st Dist. 1999).  The scope and extent of an agency relationship is a function of the agreement or intent between the agent and principal.  *Lang,* 222 Ill.App.3d at 232.  Agency can be expressed directly, as per an agreement, *Lang,* 306 Ill.App.3d at 972, or it can be implied indirectly by referring to the parties' actions, intent, and situation, *Lang,* 222 Ill.App.3d at 232.  In the case of implied authority, "[i]t arises when the conduct

---

[3]  This rule states that "[a]ll matters that are privileged against disclosure on the trial, including privileged communications between a party or his agent and the attorney for the party, are privileged against disclosure through any discovery procedure."

of the principal, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's behalf." *Curto* v. *Illini Manors, Inc.*, 405 Ill.App.3d 888, 892 (3d Dist. 2010). Generally, the issue of whether an agency relationship exists and the scope of the purported agent's authority are questions of fact. *Progress Printing Corp. v. Jane Byrne Political Comm.*, 235 Ill.App.3d 292, 306 (1st Dist. 1992). The party claiming agency must prove such a relationship by a preponderance of the evidence. *Curto,* 405 Ill.App.3d at 892.

Defendants challenge Plaintiffs' assertion of privilege as to each email where Janick was a sender or recipient on grounds that dissemination of the communications to and from him—a third party but not an agent—prevented the privilege from attaching. Defendants rely on the deposition testimony of the Band members to show that while they considered Mercado and Youngman to be their personal managers and agents, they simply viewed Janick as a "consultant," or perhaps just some guy who bought them dinner. (R. 207, Defs.' Mot. at 6.) Defendants also point out that Plaintiffs did not disclose Janick or even mention his name in their response to Defendants' interrogatories when asked to identify persons with knowledge or information concerning the issues raised in this lawsuit. (R. 207, Defs.' Mot. at 7-8.) Nor, Defendants assert, did Plaintiffs disclose Janick in their Rule 26(a)(1) disclosures. (Id. at 8.) Finally, they argue that payments to Janick totaling more than $450,000 do not reflect payments made in a managerial capacity. (Id.)

10

Plaintiffs, on the other hand, maintain that Janick served as the Band's personal manager from late 2009 until mid-2012. (R. 249, Pls.' Resp. at 6.) In support of this position, Plaintiffs claim that Janick worked with Managers Mercado and Youngman "to guide the professional career of [the Band] in the music entertainment industry, which included assessment and strategy regarding the legal issues affecting the Band." (Id.) Plaintiffs further contend that Janick worked with the Band's lawyers "concerning professional strategy, long-term plans and personal decisions that might affect the Band's career." (Id.) They claim that Janick was sometimes "the Band's voice to its attorneys," and that his company, Fueled by Ramen, was paid commissions in the amount of approximately $450,000 for his services as a manager. (Id.) These commissions, they assert, are evidence of a significant relationship between Janick and the Band. (Id. at 8.) Finally, Plaintiffs maintain that there is no real distinction between a "manager" and a "consultant" and that both can be agents under the right circumstances. (Id. at 8-9.) [4]

---

[4] The court regards the term "manager" as synonymous with "agent" but rejects Plaintiffs' attempt to equate the term "consultant" with "agent" within the context of this case. (*See* R. 249, Pls.' Resp. at 8-9.) Although a consultant can be deemed an agent under certain circumstances—a point discussed more fully later in this opinion—the court will hold Plaintiffs to their principle position that Janick served as a manager/agent and will reserve use of the term "consultant" to mean a person "who gives professional advice or services to companies for a fee," *see Merriam-Webster's Collegiate Dictionary* (Frederick C. Mish, et al. 11th ed. 2004), but whose involvement does not rise to the level of an agent. These designations do not change the analysis but help provide clarity. That being said, the court will carefully evaluate the Band's use of the word "consultant" in order to ascertain the meaning the Band ascribed to it, recognizing that the Band may be using the term differently than the court. It should also be noted that in resolving the agency question, the

### 1.     Testimony of the Band Members

As Plaintiffs point out, it is Janick's relationship with the Band—not with Mercado and Youngman or Fly South Musical Group—that is central to the determination of whether Janick served as an agent for the Band.  (R. 249, Pls.' Resp. at 7); *see also Lang*, 222 Ill.App.3d at 232 ("[T]he authority of an agent may only come from the principal, and the authority, therefore, must be traced to some word or act of the alleged principal, not the acts or words of the agent.").  As there is no operative agreement creating an express agency relationship, the question of fact for the court is whether the Band's conduct caused Janick to believe he was authorized to act on its behalf.  *See Lang*, 222 Ill.App.3d at 232.   Accordingly, the court turns to the testimony of the Band members to assess the nature of this relationship.

Band member Woodard testified at his deposition that he believes he met Janick at a concert in New York and that they kept in touch "[j]ust to see how we were doing with each other, with each other's lives and careers and what we were doing." (R. 209, Meloni Decl., Ex. F, Woodard Dep. at 303.)  When asked whether Janick had an interest in the Band, Woodard answered that he is "a fan for sure." (Id.)  When asked what kind of things Janick did for the Band, Woodard answered, "[c]onsulting just like overall, just kind of just making sure things were happening. And I don't know.  Just, I think, ideas."  (Id. at 316.)  Woodard described Mercado

---

court will not rely on any information gained through an improper use of the emails, most notably certain portions of Manager Mercado's deposition testimony.

and Youngman as the Band's "main" managers. (Id. at 317.) He explained that "[a]ny communication between management for A Day To Remember and the label would have gone through [Mercado], anyway, never through [Janick] anyway." (Id. at 323.) When asked why Janick was not given "credit" on a particular musical release by the Band, whereas Mercado was, Woodard replied, "[b]ecause Mark Mercado is our main guy." (Id. at 355.) He added that "[Mercado] and [Youngman] are the people we talked to. I never talked on the phone with Janick about plans or anything like that. Those two are the ones who handled everything. . . . Our management is Mark Mercado and John Youngman. John Janick is more of a consultant." (Id. at 366.) Finally, when asked how often he speaks with Janick, Woodard answered, "not often," and when asked how often he meets with Janick, he said, "less than not often." (Id. at 374.)

Band member McKinnon also remembers first meeting Janick at a show and felt that he "was just another person" he met "along the way." (R. 209, Meloni Decl., Ex. G, McKinnon Dep. at 10.) He stated that Janick was part of his management team as a "consultant." (Id. at 14.) When asked whether he had ever authorized the Band's financial manager Hartough to make payments to Janick, McKinnon answered "[n]o. We never spoke about stuff like that." (Id. at 15.) He explained that it was Manager Hartough's job to handle such things. (Id.) And when asked what Managers Mercado and Youngman did for the Band, McKinnon responded, "[t]hey're legitimate managers and they're completely watching over everything we do and making sure we're making the right moves at the right time." (Id. at 32.) As

for Janick, McKinnon stated that he could run ideas past him and that "[h]e was just a consultant in everything that we did." (Id. at 34.)

Band member Skaff testified at his deposition that his manager is Mercado. (R. 209, Meloni Decl., Ex. H, Skaff Dep. at 15.) When asked if he knew Janick he responded affirmatively and added that "[h]e just – he brings us to dinner every now and then." (Id.) Skaff also added that he met Janick a few times in New York and went out to dinner with him but that they did not talk about the music business. (Id. at 17.) He cannot recall the last time he saw Janick and does not know whether or not Janick ever represented the Band. (Id. at 19.)

Band member Shelnutt testified at his deposition that the Band's current managers are Mercado and Youngman. (R. 209, Meloni Decl., Ex. I, Shelnutt Dep. at 10.) When asked whether he knew of any other managers, Plaintiff Shelnutt said, "[n]ot that I know of." (Id.) Band member Westfall testified similarly at his deposition that the Band's managers are Mercado and Youngman. (R. 209, Meloni Decl., Ex. J, Westfall Dep. at 37.) He also is not aware of anyone else serving as a personal manager for the Band. (Id. at 38.) He testified that he had dinner with Janick a few times in New York but does not remember why the dinners took place. (Id. at 62.)

The uncontested and uncontradicted testimony of the Band members significantly undermines Plaintiffs' contention that Janick acted as a manager for the Band. All of the Band members unequivocally represented that Mercado and Youngman were their "main" guys who "handled everything" for them. Woodward

14

and McKinnon had the most formed impressions of Janick and they both testified that Janick was some sort of "consultant" to whom they would go with "ideas." Skaff and Westfall had almost no involvement with Janick and viewed him as someone who bought dinners for the Band. Shelnutt testified that he was aware of only Mercado as his personal manager. None of the testimonial evidence from the Band members suggests that Janick occupied a role within the Band's inner circle. Janick was available to provide creative guidance, advice, and support but there is no evidence of an agency relationship whereby the Band had the power to direct Janick's actions and Janick, for his part, had the power to act on behalf of the Band.

### 2. Other Evidence Suggestive of an Agency Relationship

The court turns next to whether there is other evidence supporting the creation of an agency relationship. Looking first to the emails in dispute, the court notes that Janick's involvement with respect to these communications was extremely minor and hardly suggestive of an integral role. Janick is copied on these emails but only once did he personally initiate an email (ADTR 1454), and this email served only to comment positively on Mercado's effort on a particular topic. (R. 157, Meloni Decl., Ex. A, ADTR 1454.) Otherwise, Janick made only one other comment, thanking the author in response to an email thread. (Id. at ADTR 1447.)

Next, although Plaintiffs argue that Mercado "had authority to and occasionally did engage additional managers such as Janick to assist the Band in all aspects of their business, including the analysis of legal issues," (R. 249, Pls.' Resp. at 8), there is no independent evidence substantiating this claim. Plaintiffs have

not provided the court with a management agreement between Mercado and the Band, or between Janick and the Band. And although Mercado submitted a Declaration setting forth his duties, the Declaration simply states that his job, along with Youngman and Curo Financial Management, was, in part, to "facilitate communication between the band members and their attorneys, relay advice and legal strategy to the band, and communicate with its attorneys on their behalf to determine such legal strategies." (R. 172, Mercado Decl. at ¶ 1.) No mention is made of any grant of authority to hire other managers. In fact, Mercado's Declaration does not even mention Janick in any capacity. (Id.) As for Plaintiffs' contention that Mercado could and did "engage" additional managers such as Janick, (R. 249, Pls.' Resp. at 8), this argument conflicts directly with Mercado's own deposition testimony that Janick "was not involved with Fly South" and that Janick was the Band's manager "from day one"—the same day the Band hired Fly South. (R. 209, Meloni Decl., Ex. D, Mercado Dep. at 19.)

Setting aside for the moment the conflict noted between Mercado's testimony and Plaintiffs' suggestion that Mercado exercised his authority to hire Janick, the court also finds telling the lack of testimonial or other evidence establishing that the Band knew anything about Mercado's purported exercise of authority. While Plaintiffs proffer the Declaration of Janick (R. 173), in an effort to establish that he did act in a managerial capacity, the court turns again to the perspectives and actions of the Band members as most instructive on this point. *See Kaporovskiy v. Grecian Delight Foods, Inc.,* 338 Ill.App.3d 206, 210 (1st Dist. 2003) (finding that

16

"[o]nly the alleged principal's words and conduct, not those of the alleged agent, establish the agent's authority"); *Rasgaitis v. Waterstone Fin. Grp., Inc.*, 2013 IL App (2d) 111112, 985 N.E.2d 621, 635 (2d Dist. 2013) (stating that implied authority "arises when the conduct of the principal, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's behalf"). Again, the court finds highly persuasive the fact that the Band members consistently identified only Mercado and Youngman as their managers. Janick's Declaration to the contrary carries little weight.

Finally, the court observes that Plaintiffs failed to disclose Janick during written discovery as a person with information about the case. If Janick were such an integral member of the Band's management team, then Plaintiffs would have been obligated to disclose his name earlier in the discovery process.

### 3. Evidence Pertaining to Janick's Relationship with the Band's Attorneys

The court turns next to Plaintiffs' assertion that even if Janick were deemed a consultant, consultants can also serve as agents under certain circumstances. The court agrees with Plaintiffs that consultants can serve as agents under certain circumstances and thus fall within the ambit of the attorney-client privilege. However, Plaintiffs have not shown that the circumstances here elevate Janick to the status of an agent. Most applicable are those cases in which third parties such as accountants and investment banking firms have qualified as agents based upon a showing that they "assist[ed] a lawyer in giving legal advice," and that their "participation was required to enable the attorney to render legal advice." *Heriot*,

257 F.R.D. at 666. For instance, in *Lawrence E. Jaffe Pension Plan v. Household Int'l,* 244 F.R.D. 412 (N.D. Ill. 2006), the attorney-client privilege applied to the defendants' communications with accountants retained to "conduct complex quantitative analysis and extensive information-gathering" that was beyond "[the defendants'] counsel's resources and abilities." *Id.* at 420. In so holding, the court recognized that "the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others and must include all the persons who act as the attorney's agents." *Id.* (*quoting Cavallaro v. United States*, 284 F.3d at 247 (1st Cir. 2002)).

In this case, while Plaintiffs maintain that Janick acted as the Band's personal manager between late 2009 and mid-2012 and that his job "included working with the attorneys representing the band on strategy and to facilitate communication and understanding in the relationship between the band and its attorneys," (R. 173, Janick Decl. at ¶ 4), there is no evidence other than this conclusory assertion to show that Janick truly functioned in this role. There is nothing in writing showing why the Band retained Janick or that otherwise sets forth the exact nature of his employment. Nor is there any evidence demonstrating that Janick provided the Band's counsel with expertise necessary to assist counsel in the rendering legal advice. In other words, there is nothing to suggest that Janick's involvement was critical to the Band's attorneys' ability to advise the Band. Accordingly, the court declines to find that Janick—as a consultant—otherwise qualifies as an agent of the Band's attorneys.

18

Based on the information provided by both parties, the court finds that Janick acted as a third-party consultant to the Band and provided his opinions, ideas, and overall guidance but did not serve as the Band's agent or the Band's attorneys' agent. The Band was entitled to pay Janick handsomely for his consultative services, but there remains a lack of conduct or understanding by the Band, and a corresponding lack of action by Janick, evidencing an agency relationship whereby the Band had the power to direct Janick's actions and Janick, for his part, had the power to act on behalf of the Band. Because Janick did not serve as the Band's agent, emails marked ADTR 1433-48 and 1451-75 are not confidential or privileged and may be used by Defendants for any purpose related to this litigation. However, emails marked ADTR 1449-50, which do not involve Janick, are protected by the attorney-client privilege and may not be used by Defendants for any purpose related to this litigation.

## Conclusion

For the foregoing reasons, Defendants' motion for an order seeking a declaration that ADTR 1433-75 are not protected by the attorney-client privilege is granted in part and denied in part.

**ENTER:**

_____

**Young B. Kim**
**United States Magistrate Judge**