**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSHUA WOODARD, NEIL WESTFALL,<br>ALEX SHELNUTT, JEREMY MCKINNON,<br>all professionally known as A DAY TO<br>REMEMBER,** | ) <br> ) <br> ) <br> ) <br> ) | |
| **Plaintiffs/Counter-Defendants,** | ) <br> ) | **11 C 7594** |
| **v.** | ) <br> ) | **Judge John Z. Lee** |
| **VICTORY RECORDS, INC., AND ANOTHER<br>VICTORY, INC.,** | ) <br> ) <br> ) <br> ) | |
| **Defendants/Counter-Plaintiffs.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Joshua Woordard, Neil Westfall, Alex Shelnutt, and Jeremy McKinnon are members of the band "A Day to Remember." They entered into a recording agreement with Defendant Victory Records, Inc. in 2006, but terminated the agreement some years later, believing that all of their obligations had been fulfilled. Victory disagreed, and this dispute ensued.

For their part, Plaintiffs seek a judgment declaring that they have performed their obligations under the recording agreement and that they (rather than Victory) own the copyrights to songs recorded under the agreement. Plaintiffs also assert claims for breach of contract and accounting, as well as for violations of the Tennessee Consumer Protection Act, the Illinois Consumer Fraud Act, the Illinois Right of Publicity Act, and the Lanham Act. In response, Defendants Victory Records and Another Victory, Inc., filed a counterclaim seeking declaratory judgment on the same issues as Plaintiffs (although, of course, requesting the opposite result) and assert claims for breach of contract.

Both sides have filed motions for summary judgment. For the reasons provided below, Plaintiffs' motion for partial summary judgment [327] is denied, and Victory's motion for summary judgment [324] is granted in part and denied in part.

**Factual Background**

Plaintiffs Joshua Woordard, Neil Westfall, Alex Shelnutt, and Jeremy McKinnon are members of the rock band A Day to Remember ("ADTR"). In 2006, ADTR entered into an exclusive recording agreement with Victory Records. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 1, ECF No. 325. The agreement, labeled a "Deal Memo," provided for the production of five "albums." *See* Deal Memo at 1, Second Am. Compl., Ex. A, ECF No. 216.

For each album, the Deal Memo set out a royalty rate that increased if the album sold more than a certain number of units. *See id.* These royalty rates ranged from 11.5 percent to 15.5 percent. In addition, the parties agreed to split equally any revenue from third-party licenses. *See id.*

The crux of this dispute is whether ADTR has met its obligation to deliver five albums to Victory, as that term appears in the Deal Memo. There are thirteen recording projects by ADTR, three of which Victory concedes are, in fact, "albums": *For Those Who Have Heart*; *Homesick*; and *What Separates Me From You*. *See* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 5, 27, 47.

Of the remaining ten recording projects, four relate in some fashion to *For Those Who Have Heart*: (1) a recording of a live concert in Florida of songs from the album; (2) a combination consisting of the studio-recorded audio tracks with video footage, *For Those Who Have Heart – Reissue* (CD/DVD); (3) a digital version of the reissue; and (4) a vinyl version. *See* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 5–17; Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 5–17, ECF No. 362.

Three of the remaining projects relate to *Homesick*: (1) a recording of a live concert in Switzerland; (2) *Homesick – Special Edition*, which includes the studio-recorded audio tracks from the qualifying album along with acoustic versions of two songs; and (3) a combination of the studio-recorded audio tracks and video footage, *Homesick – Special Edition Deluxe* (CD/DVD). *See* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 27–40; Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 27–40.

The remaining three projects in dispute are—for lack of a better term—free-standing: an EP titled *Attack of the Killer B Sides*, which consisted of four songs; a single titled "All I Want" containing two versions of the song from *What Separates Me from You*; and a record titled *Old Record*, which was a re-release of an album entitled *And Their Name Was Treason* that the band had recorded for a previous label. *See* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 18–26, 41–46, 54–57; Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 18–26, 41–46, 54–57.

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts[,]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir.2012). The Court will, however, "limit its analysis of the facts on summary judgment to evidence that is

properly identified and supported in the parties' [Local Rule 56.1] statements." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).

<u>Analysis</u>

## I.       Ownership of the Copyrights

In Count II of their complaint, ADTR seeks a declaratory judgment that they are the owners of all copyrights arising from songs that were recorded pursuant to the Deal Memo. *See* Second Am. Compl. ¶¶ 18–19. When it comes to musical recordings, there are two types of copyrights at play: (1) copyrights in the actual recordings of the performance of the songs, and (2) copyrights in the composition for each song, meaning the musical notes and lyrics that make up the song. *See id.*; *Johnson v. Cypress Hill*, 641 F.3d 867, 870 n.5 (7th Cir. 2011). A copyright owner is entitled to a bundle of six different exclusive rights:

**(1)** to reproduce the copyrighted work in copies or phonorecords;

**(2)** to prepare derivative works based upon the copyrighted work;

**(3)** to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

**(4)** in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

**(5)** in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

**(6)** in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106. "These rights are divisible, meaning that the owner may convey each one of them to a different person." *HyperQuest, Inc. v. N'Site Solutions, Inc.*, 632 F.3d 377, 382 (7th Cir. 2011) (citing 17 U.S.C. § 201(d)(2)). Furthermore, pursuant to the Copyright Act, "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument

of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a).[1]

"The interpretation of an unambiguous contract is a question of law, and therefore a dispute over the terms of an unambiguous contract is suited to disposition on summary judgment." *Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004). A contract is deemed ambiguous if its language is susceptible to more than one reasonable interpretation. *Guerrant v. Roth*, 777 N.E.2d 499, 503 (Ill. App. Ct. 2002). Under Illinois law, there are two different kinds of ambiguity. *Home Ins. Co. v. Chi. & Nw. Transp. Co.*, 56 F.3d 763, 768 (7th Cir. 1995). "A contract may be internally unclear or inconsistent as when it is 'reasonably and fairly susceptible to more than one meaning,' and thus, intrinsically ambiguous." *Id.* "Or it may be extrinsically ambiguous, being clear on its face but someone who knows the context of the contract would know that the contract means something other than what it seems to mean." *Id.*

In Count II of the complaint, ADTR seeks declaratory judgment that it owns all rights and interests, including copyrights, in the recordings and the compositions. *See* Second Am. Compl. ¶ 18. Victory and ADTR have both filed motions for summary judgment on this issue. Pls.' Mem. Supp. Mot. Summ. J. at 1, ECF No. 328; Defs.' Mot. Summ. J. at 1, ECF No. 324.

### A.     Copyrights in the Recordings

ADTR argues that it has all copyrights in the recordings and never transferred any rights to Victory. *See* Pls.' Mem. Supp. Mot. Summ. J. at 1. Victory, on the other hand, contends that the Deal Memo gave it an exclusive license to reproduce, distribute, and perform the work

---

[1]     The phrase "transfer of copyright ownership" is defined as "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101.

publicly by means of audio transmission. *See* Defs.' Mot. Summ. J. at 3 (citing § 106(1), (3), and (6)).[2]

> The main provision of the Deal Memo states:
>
> [Victory] hereby engages your exclusive personal services as a recording artists in connection with the production of Records and you hereby accept such engagement and agree to exclusively render such services for [Victory] in the Territory during the Term and all extensions and renewals thereof.
>
> Exclusive, 5 Album deal with option on second, third, fourth and fifth album. . . .
>
> An Album is a of reproduction, transmission or communication of Recordings, not or hereafter known, manufactured, distributed, transmitted or communicated in any format. [ADTR] agrees to and allows [Victory] to sell music, images and anything else relating to the Artist via mobile technologies consisting of ringtones, ringbacks, mastertones, wallpapers and any other format or method now or hereafter known.

Deal Memo at 1.

Based upon the language in the Deal Memo, the Court concludes that it unambiguously gives Victory an exclusive license to distribute the "albums" created as part of the agreement. The parties are not required to use specific terms, such as the word "copyright" or "right to distribute," to evince a transfer of rights and comply with § 204(a). *See ITOFCA*, 322 F.3d at 931. Instead, as in other instances of contract interpretation, courts must look at the intent of the parties as expressed in the written contract. *See Kennedy v. Nat'l Juvenile Detention Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999) ("Normal rules of contract construction are generally applied in construing copyright agreements."). Here, the contract makes clear that Victory was acquiring the right to distribute the music ADTR produced as part of the Deal Memo. The agreement envisions that ADTR would produce up to five albums and Victory would then sell those albums

---

[2] For copyrights in sound recordings, the bundle of rights that a copyright owner has is limited to § 106(1) (right to reproduce), § 106(2) (right to prepare derivative works), § 106(3) (right to distribute by sale), and § 106(6) (right to perform publicly by means of digital audio transmission). *See* 17 U.S.C. § 114(a).

and pay ADTR a recording advance and royalties based on how well each album sold. In order for this arrangement to make economic sense, Victory had to receive an exclusive license to distribute the albums. The alternative explanation, which ADTR espouses, is that Victory had a nonexclusive license to distribute the albums. But this argument fails on two counts.

First, it completely ignores the fact that the agreement calls for an "exclusive" deal, both in the band's provision of services and in its delivery of the five albums to Victory. Second, under the band's interpretation of the Deal Memo, ADTR would be able to collect the recording advance ($20,000) and then immediately enter into another agreement to distribute with a competing recording company—or, for that matter, distribute the album themselves. The Court need not accept this perverse reading of the Deal Memo. "When a contractual interpretation makes no economic sense, that's an admissible and, in the limit, a compelling reason for rejecting it." *Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1119 (7th Cir. 2002); *see also Edgenet, Inc. v. Home Depot U.S.A., Inc.*, 658 F.3d 662, 666 (7th Cir. 2011) ("Edgenet's argument that this means only the 2004 or 2006 version of the taxonomy amounts to a contention that it mousetrapped its customer. We are surprised that a firm seeking good relations with other customers would advance such an ignoble position.").

Victory limits its motion for summary judgment on Count II to the exclusive right to distribute the recordings (§ 106(3)). *See* Defs.' Mot. Summ. J. at 3 n.3. Accordingly, the Court grants Victory's motion for Count II as to rights listed in § 106(3) for the copyrights in the recordings. Because Victory has, at a minimum, exclusive rights to distribute the albums, the Court denies ADTR's motion seeking declaration judgment as to all copyrights in the recordings.

## B.    Copyrights in the Compositions

Unlike with the copyrights in the recordings, the Deal Memo is ambiguous as to the transfer of copyrights in the compositions.[3] The Deal Memo states in relevant part:

> **5. Publishing**
> $15,000 fully recoupable advance, for publishing deal with Another Victory Inc. (ASSCAP). The publishing advance will be paid half upon signing of this Deal Memo and the balance on commencement of Recording of Album 1.

Deal Memo at 2.

Based on this language, the Court holds that the Deal Memo is ambiguous as to whether it transfers the copyrights in the compositions to Victory. On the one hand, the Deal Memo may be contemplating that ADTR and Another Victory—Victory's publishing affiliate—will enter into a separate publishing deal. Under this reading, because the publishing deal was never finalized, there was never a transfer of copyrights in the compositions. On the other hand, the parties may have considered section 5 of the Deal Memo was sufficient to give Another Victory publishing rights, and any separate agreement would merely expound on the terms of that transfer. After all, according to the terms of the Deal Memo, ADTR was to receive half of the publishing advance at the time the Deal Memo was signed. This suggests that it is at least plausible that the parties considered the Deal Memo itself to be a transfer of the copyrights in the compositions.

In fact, there is evidence in the record from which a reasonable jury could find that the Deal Memo in fact transferred the copyrights in the compositions. In a discussion with the band's manager over a negotiation with Victory's president, one of the band members wrote "Give us our publishing . . . ," suggesting that the publishing rights were Victory's to provide. Defs.' LR

---

[3]    The term "publishing" is used by both parties to refer to the exploitation of copyrights in the compositions. *See* Pls.' Mem. Supp. Mot. Summ. J. at 3 n.2.

56.1(b)(3)(B) Stmt. ¶ 33, ECF No. 374.[4] Taking this evidence in the light most favorable to Victory, a fact-finder could find that the parties intended section 5 of the Deal Memo to transfer the publishing rights to Victory.

Accordingly, the Court denies both ADTR's and Victory's motions for summary judgment on Count II as they relate to the copyrights in the compositions.

## II.    Number of Albums Delivered

One of the central questions presented in this case is whether ADTR satisfied its requirement under the Deal Memo to deliver five "albums." In an earlier ruling, the Court concluded that the term "Album" as it appears in the Deal Memo is intrinsically ambiguous. *See* Min. Order 8/30/2013, ECF No. 203; Transcript 8/30/2013 at 6:10–11, ECF No. 230. Following the Court's ruling, both sides have put forth expert witnesses to comment on the common usage of the term in the music industry. In its motion for summary judgment, Victory seeks to exclude a number of recording projects from qualifying as "albums."[5]

### A.    Victory Seeks to Exclude Five Projects

ADTR's own expert testified that, based on industry custom, seven of the thirteen total projects by the band should be considered "albums." *See* Light Expert Report at 3–4, Pls.' Resp.

---

[4]    ADTR argues that the band member could have been asking that Victory pay the publishing advance for *What Separates Me From You*, which the band claims was not paid on time. *See* Pls.' Resp. Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 33, ECF No. 386. Even under ADTR's interpretation of the email, the band member is asking for the *publishing* advance. Presumably ADTR is receiving a publishing advance because Another Victory received the copyrights in the compositions.

[5]    In addition to its 28-page memorandum of law, Victory submits in support of its motion an 18-page "declaration" by its counsel, Robert Meloni, which consists entirely of additional arguments. This is an improper attempt by Defendants to circumvent the page limits imposed by the Court, and the declaration will be disregarded in its entirety. Any similar attempts to skirt the orders of this Court by either side will be sanctioned.

Mot. Exclude Light, Ex. 2, ECF No. 359.[6] Citing to this testimony, Victory asks the Court to grant summary judgment as to the remaining five projects, contending that there is no evidence to support the conclusion that they are "albums." *See* Defs.' Mot. Summ. J. at 14–15. ADTR counters by pointing to the depositions of the band members in which they state they believed all thirteen projects would qualify as "albums" under the Deal Memo. *See* Pls.' Resp. Mot. Summ. J. at 1–4, ECF. No. 360.

In response, Victory argues that ATDR cannot rely on the subjective intent of its band members to create a genuine issue of material fact and cites *Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989). Victory is correct insofar as a party to a contract cannot rely upon subjective intent to create ambiguity where none exists. *See Home Ins. Co. v. Chi. & Nw. Transp. Co.*, 56 F.3d 763, 768 (7th Cir. 1995) ("'Subjective' evidence of ambiguity is 'the testimony of the parties themselves as to what they believe the contract means,' which is invariably self-serving, inherently difficult to verify and thus, inadmissible."). But where, as here, the term in question is ambiguous as a matter of law, "a court can consider extrinsic evidence to determine the parties' intent," including evidence regarding the subjective intent of the parties to the contract. *Motorola Sols., Inc. v. Zurich Ins. Co.*, 33 N.E.3d 917, 941 (Ill. App. Ct. 2015); *see also Joy v. Hay Grp., Inc.*, 403 F.3d 875, 878 (7th Cir. 2005) ("When as in this case the written contract is unclear, *any* evidence admissible under the rules of evidence is usable to establish the contract's meaning."). Although the testimony of the band members may be at

---

[6] Jeffrey Light, ADTR's expert, testified that the following seven projects were albums: the three qualifying albums (*For Those Who Have Heart*, *Homesick*, *What Separates Me From You*); the two "live albums"; and the two combinations of studio-recorded tracks and video footage. *See* Defs.' Mot. Summ. J. at 14–15 (citing Light Expert Report at 4, Pls.' Resp. Mot. Exclude Light, Ex. 2, ECF No. 359).

odds with their own expert, the jury is entitled to weigh their relative credibility, and summary judgment is not appropriate.

### B. The *Old Record* Project

*Old Record* is a project that ADTR had previously released with a different recording company. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 18. Victory had prepared a document, separate from the Deal Memo, in which it agreed to re-release *Old Record*. *See id.* ¶¶ 18–19. Tony Brummel, Victory's CEO, sent the document to Woodard, but the band members never signed it. *See id.* ¶ 19. Nevertheless, Victory released *Old Record* in 2008. Victory now seeks to exclude ADTR from being able to assert that *Old Record* counts towards the five albums required by the Deal Memo. *See* Defs.' Mot. Summ. J. at 15.

There is no dispute that the unexecuted *Old Record* agreement cannot constitute an agreement, separate and apart from the Deal Memo, to release *Old Record*. The question, then, is whether there was an oral agreement between Victory and ADTR with terms substantially similar to those contained in the unsigned document. Victory's motion for summary judgment goes to great lengths to put forth why the oral agreement would not be barred by the statute of frauds. But as ADTR points out, there is a disputed fact as to whether an oral agreement existed in the first place. *See* Pls.' Resp. Mot. Summ. J. at 4. In fact, there is deposition testimony from multiple band members asserting that there was never an agreement regarding the release of *Old Record*. *See, e.g.*, McKinnon Dep. at 136:21–137:9, Pls.' LR 56.1(b)(3)(C) Stmt., Ex. 4, ECF No. 361. Because the existence of the agreement is a disputed fact, summary judgment is not appropriate as to this issue.

### III. Royalty Rate for Digital Downloads

Victory and ADTR also disagree as to the proper royalty rate the band was due for digital downloads (that is, revenue from sources like iTunes). Victory claims that the royalty rate for

digital downloads should range from 11.5 percent to 16.6 percent, the rates paid for sales of physical copies of ADTR's albums. *See* Deal Memo at 1. On the other hand, ADTR argues that the appropriate royalty rate for digital downloads is 50 percent, the rate applied to revenue from third-party licenses. *See* Deal Memo at 2.

Victory contends, as a threshold matter, that the dispute is not properly before the Court. According to Victory, the complaint makes no mention of the incorrect royalty rate for digital downloads, and ADTR's claim that Victory applied the incorrect royalty rate for digital downloads was first raised in Coleman's expert report. *See* Defs.' Mot. Summ. J. at 17–18.

Not surprisingly, ADTR disagrees, claiming that "Plaintiffs' breach of contract claim asserts that 'Defendants have failed to . . . pay royalties pursuant to the Deal Memo,' which includes a failure to pay royalties on digital downloads at the appropriate rate." Pls.' Resp. Mot. Summ. J. at 7 n.9. At best, the band's reference to the complaint is woefully incomplete; at worst, it is deceptive and misleading. The full paragraph states:

> The Defendants have breached the Deal Memo because they have, despite their agreement otherwise, created reserves for digital sales. Through the creation of these unauthorized reserve accounts, the Defendants have retained funds which have been earned by and should have been paid to Plaintiffs. In addition, the Defendants have breached the Deal Memo by failing to follow the schedule for the creation and liquidation of reserves for returns of physical goods. Moreover, because Victory's advertised "Return Policy" is that "all sales are final," and "we do not allow returns for any items," with respect to merchandise sold online, establishing a "reserve for returns" account at all for such sales is not appropriate. Despite Plaintiffs' repeated demands, the Defendants have failed to liquidate such accounts and pay royalties pursuant to the Deal Memo.

Second Am. Compl. ¶ 20.

The reserve accounts referenced in this paragraph relate to another portion of the Deal Memo:

> **9. Accounting / Payment:**
> Royalty statements will be issued quarterly, 60 days after quarter end. Royalties will be paid only on sales for which Company has been paid for. A reserve for

> returns will be set at 25%, liquidated as follows: 50% of each reserve (4) quarterly accounting periods after such reserve is established and 50% of each such reserve (8) quarterly accounting periods after such reserve is established. There will be no reserve for digital sales.

Deal Memo at 2. In essence, ADTR's breach of contract claim asserts (1) that Victory violated the explicit language of the contract by creating reserve accounts for digital sales and (2) that Victory's creation of reserve accounts for merchandise was unnecessary given their no-returns policy. Nowhere in the complaint does ADTR allege that Victory was applying the wrong royalty rate for digital sales.

Because the question of the proper rate for digital downloads was not raised in the complaint or at any other point in the proceedings prior to Coleman's expert report, the Court finds that it is not properly before the Court and allowing ADTR to raise the issue at such a late stage in these proceedings would unduly prejudice Defendants. As such, the Court grants Victory's motion for summary judgment as to this issue.

## IV.    Tennessee Consumer Protection Act and Illinois Consumer Fraud Act

ADTR alleges violations of the Tennessee Consumer Protection Act (TCPA) and the Illinois Consumer Fraud Act (ICFA) based on purportedly deceptive royalty statements from Victory. In order to establish a violation of the TCPA, a plaintiff must prove "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an ascertainable loss of money or property." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005). Similarly, the elements of a claim under the ICFA are "(1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996).

In addition, the plaintiff must show that the consumer fraud was the proximate cause for the plaintiff's injury. *See id.*

Victory's principal argument is that ADTR has failed to present any evidence that Defendants committed an unfair or deceptive act sufficient to trigger either state statute. Instead, according to Victory, ADTR is trying to convert run-of-the-mill breach of contract claims into deceptive practices claims under the TCPA and ICFA. *See* Defs.' Mot. Summ. J. at 6–9. *See Hall v. Hamblen*, 2004 WL 1838180, *4 (Tenn. Ct. App. 2004) ("A party bringing a TCPA action must prove that there was some deception, misrepresentation or unfairness, regardless of any breach of contract."); *Brody v. Finch Univ. of Health Scis./The Chi. Med. Sch.*, 698 N.E.2d 257, 268 (Ill. App. Ct. 1998) ("A breach of contract, without more, is insufficient to sustain a cause of action cognizable under the [ICFA]."). The Court agrees.

The cornerstone of ADTR's TCPA and ICFA claims is its contention that the royalty statements Victory sent to the band were deceptive and misleading, because they omitted information that would have made clear to ADTR that Victory was breaching its contract (at least, as the band interprets it). As stated by ATDR's business manager, Jason Childress, "the royalty statements do not disclose information necessary to determine whether ADTR has been paid in full and accurately." *See* Childress Decl. ¶ 5, ECF No. 223. But if such omissions were sufficient to state a claim under the TCPA and ICPA, virtually any breach of contract claim could be fashioned as deceptive practices claim. After all, the amounts set forth in Victory's invoices are inaccurate only if ATDR's breach of contract claim has merit (which, of course, Victory contests). And, under ATDR's theory, all one has to do to convert a breach of contract claim to a deceptive practice claim is to point to an invoice or receipt and assert that the issuing party should have detailed how it arrived at the amount (which, of course, would be contested).

The Court does not believe that the law imposes such an affirmative burden upon a party to a contract to do so, absent a contractual obligation or statutory or regulatory requirement compelling such disclosures.[7] *See Crossley Const. Corp. v. Nat'l Fire Ins. Co. of Hartford*, 237 S.W.3d 652 (Tenn. Ct. App. 2007) ("The adoption of plaintiff's position would result in virtually every breach of contract case coming under the umbrella of the Tennessee Consumer Protection Act of 1977, an intention clearly never intended by our General Assembly."); *Zankle v. Queen Anne Landscaping*, 724 N.E.2d 988, 992–93 (Ill. App. Ct. 2000)("[I]t is settled that the [Illinois] Consumer Fraud Act was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy."). Accordingly, Victory's motion for summary judgment as to these claims is granted.

## V.     Accounting

In addition, ADTR requests an accounting of Victory's records to determine the money earned and amounts due to the band. *See* Second Am. Compl. ¶¶ 22–29. In order to state a claim for accounting, which is an equitable remedy, the plaintiff "must allege the absence of an adequate remedy at law and one of the following: '(1) a breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature.'" *Mann v. Kemper Fin. Cos.*, 618 N.E.2d 317, 327 (Ill. App. Ct. 1992). Although a claim for accounting must be denied if there is an adequate remedy at law, "there is an exception for when an accounting action is sought based upon a breach of a fiduciary duty so that a plaintiff may proceed with the action." *Id.*

---

[7]     The other "unfair or deceptive acts or practices" cited by ADTR, *see* Pls.' Resp. Mot. Summ. J. at 16, are additional ways in which Victory allegedly breached the contract with ATDR, are conclusory statements unsupported by the record, and are insufficient to trigger liability under the TCPA and ICPA.

First, ADTR has failed to show that they do not have a remedy at law. Despite arguing that no such remedy is available to them, *see* Pls.' Resp. Mot. Summ. J. at 13, ADTR has not explained why the damages that flow from its breach of contract claim would be an inadequate remedy. *See* Second Am. Compl. ¶¶ 20–21. Although ascertaining the precise amount of damages may not be a simple task, such calculations are performed routinely in breach of contract cases, and the relationship between ATDR and Victory is not so unique or complicated to necessitate an accounting. *See Zell v. Jacoby-Bender, Inc.*, 542 F.2d 34, 36 (7th Cir. 1976) (holding that an accounting claim may only go forward if the plaintiff can show that the accounts between the parties are of such a complicated nature that only a court of equity can unravel them).[8] And damages is not an inadequate remedy merely because ATDR must review Victory's records to prove them. *See id.*; *Dailey v. Sunset Hills Tr. Estate*, 332 N.E.2d 158, 163 (Ill. App. Ct. 1975) ("[P]latinff has made not allegation as to why an individual action at law for breach of contract would be inadequate."); *Oil Express Nat'l, Inc. v. Latos*, 966 F. Supp. 650, 652 (N.D. Ill. 1997) (rejecting defendants' claim for accounting because they were pursuing a breach of contract action).[9]

Second, ADTR has failed to raise any facts that would establish a fiduciary relationship between itself and Defendants. "A fiduciary relationship exists where one party reposes trust and

---

[8] The exception to this general rule, which arises when there is a fiduciary relationship, is discussed later in this section.

[9] Part of ADTR's argument for why it has no adequate remedy at law focuses on the state of the documents it received from Victory during discovery. *See* Pls.' Resp. Mot. Summ. J. at 13 ("Victory failed to provide Coleman with key documents . . . ."). To the extent that ADTR was not satisfied with the documents it received during this litigation, the proper way to challenge that is through the discovery process. ADTR provides no authority for the notion that a discovery dispute can form the basis for an accounting claim.

confidence in another, who thereby gains a resulting influence and a superiority over the subservient party." *Khan v. Deutsche Bank AG*, 978 N.E.2d 1020, 1041 (Ill. 2012). Here, ADTR points to the band members' youth and lack of experience in the music business to argue that Victory was their fiduciary. In support, ADTR points to the band members' testimony that they were all under the age of 20 when the Deal Memo was signed. *See* Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 27 (citing Ex. 2, Shelnutt Dep. at 14:19–20; Ex. 3, Westfall Dep. at 6:7–8; Ex. 4, McKinnon Dep. at 38:18–19). Aside from this, the only other factual evidence ADTR cites is Woodard's testimony that he did not review any royalty statement and just trusted they were correct. Woodard Dep. at 160:12–20, Pls.' LR 56.1(b)(3)(C) Stmt., Ex. 1. These facts, even when construed in ADTR's favor, are not sufficient to establish a fiduciary relationship between the band members and Victory. *See Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992) ("[P]arties to a contract are not each other's fiduciaries.").

Because ADTR had an adequate remedy at law and cannot show that there was a fiduciary relationship with Victory, the Court grants Victory's motion for summary judgment as to the accounting claim.

## VI. The Illinois Right of Publicity Act and the Lanham Act

Plaintiff McKinnon alleges that Victory misused his image and likeness for commercial purposes in connection with the sale of merchandise in violation of the Lanham Act, 15 U.S.C. § 1125(a), and the Illinois Right of Publicity Act (IRPA), 765 Ill. Comp. Stat. 1075/1–60. *See* Second Am. Compl. ¶¶ 55–60. The depiction at issue is a drawing of a man, who allegedly looks like McKinnon, dressed in clothing sold by Victory. *See* Image, Second Am. Compl., Ex. B. Victory counters that summary judgment should be granted as to ADTR's false endorsement

claim because the band has failed to put forth any evidence to establish a likelihood of consumer confusion. Defs.' Mot. Summ. J. at 11–12.

To state a claim for false endorsement under § 43(a) of the Lanham Act, ADTR must show that the alleged infringement likely caused customers to believe that McKinnon endorsed Victory's products. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 522 (7th Cir. 2014). The Seventh Circuit has set forth seven factors used to determine whether there was a likelihood of confusion: "(1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to 'palm off' his product as that of another." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015). Importantly, the likelihood-of-confusion inquiry focuses on confusion by the customer. *See Bd. of Regents of Univ. of Wisconsin Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 455 (7th Cir. 2011) ("To decide whether there is a likelihood of confusion between the two CONDOR products, a court must ask whether consumers, and specifically consumers who would use either product, would be likely to attribute them to a single source.").

ADTR has not presented sufficient evidence to raise a genuine issue of material fact as to likelihood of confusion. In fact, the only evidence ADTR cites is testimony by the band members that the drawing in question closely resembles McKinnon. *See* Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 31 (citing Ex. 1, Woodard Dep. at 89:1–4; Ex. 2, Shelnutt Dep. at 46:14–17; Ex. 3, Westfall Dep. at 74:11–15, 74:21–24; 75:22–25; Ex. 4, McKinnon Dep. at 352:8–24). The testimony of a band member, who may have (but likely did not) purchase any merchandise from Victory, is insufficient to create a triable issue as to the likelihood of confusion by customers. *Cf. AutoZone,*

*Inc. v. Strick*, 543 F.3d 923, 930 (7th Cir. 2008) ("We must compare the marks in light of what happens in the marketplace and not merely by looking at the two marks side-by-side."). Therefore, the Court grants Victory's motion for summary judgment as to the Lanham Act claims in Count VIII.[10]

ADTR's claim based on the IRPA is a different matter. Unlike false endorsement under the Lanham Act, the IRPA has no likelihood-of-confusion requirement. *See* 765 Ill. Comp. Stat. 1075/30 ("A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the appropriate person."); *see also Blair v. Nevada Landing P'ship*, 859 N.E.2d 1188, 1191–92 (Ill. App. Ct. 2006) (stating that the IRPA's limitations on using a person's identity are essentially the same as the elements of a common law appropriation-of-likeness claim: an appropriation of one's name or likeness, without one's consent, for another's commercial benefit). Because the Illinois statute does not contain a requirement to show a likelihood that customers would be confused, Victory's argument does not apply equally to the IRPA claim. *See* 1 Rights of Publicity and Privacy § 5:19 (2d ed) ("'[A] right of publicity claim does differ from a false advertising claim in one crucial respect; a right of publicity claim does not require any evidence that a consumer is likely to be confused.'" (quoting *Parks v. LaFace Records*, 329 F.3d 437, 460 (6th Cir. 2003)).

Undeterred, Victory contends that the state claim should be dismissed because band has not shown that it has suffered any harm. The IRPA allows plaintiffs to recover "actual damages, profits derived from the unauthorized use, or both." 765 Ill. Comp. Stat. 1075/40. In order to

---

[10]    Furthermore, ADTR failed to present any evidence that it was harmed by the alleged infringement. *See Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1205 (7th Cir. 1990) (plaintiff must show that he has "suffered actual injury, *i.e.*, a loss of sales, profits, or present value (goodwill)"); *Badger Meter, Inc. v. Grinnell Corp*, 13 F.3d 1145, 1157 (7th Cir. 1994) (plaintiff must establish that defendant was unjust enriched by the infringing action).

obtain actual damages, "the plaintiff is required to prove the damages or gross revenue attributable to the unauthorized use." 765 Ill. Comp. Stat. 1075/45; *see also Trannel v. Prairie Ridge Media, Inc.*, 987 N.E.2d 923, 932 (Ill. App. Ct. 2013).

In this case, the only evidence of damages submitted by ADTR is a citation to the following portion of McKinnon's deposition:

> Q.     How were you harmed by it?
>
> A.     . . . It's like a misrepresentation of a brand. . . . [W]e are individually branded, and we have been doing that for years, we have, we have a public image that we uphold, we have a public understanding of who we are as human beings . . . Victory Records does not have a very good public image, and me dressed in all, all of their catalogues' merchandise sends a message. It sends a message that this person, this person that you trust, a person that you stand by supports this brand fully. I'm dressed in all of their merchandise. That says I am selling to you, my fan, this. This is what I support. That is what this is telling them, and they have a terrible, terrible public image.
>
> . . .
>
> A.     . . . This is their hoodie, their bracelets, their hat, their shorts, is this a bag? This is all of this. This is an entire brand of clothing they have, and this is them, this is their clothing brand. And that goes along with their public image. And my public image is very different from theirs.

Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 34 (citing Ex. 4, McKinnon Dep. at 354:20–355:11, 355:20–356:8). This testimony is insufficient to satisfy the requirement that ATDR prove actual damages to support an IRPA claim.

In addition to actual damages, the IRPA allows plaintiffs to recover statutory damages ($1,000) and to obtain injunctive relief. *See* 765 Ill. Comp. Stat. 1075/40, 50. Because ADTR also is seeking statutory damages as well as injunctive relief, the Court grants Victory's motion for summary judgment as to the IRPA claim only in so far as ADTR seeks actual damages. McKinnon may proceed on this claim to the extent he is seeking statutory damages or injunctive relief.

**<u>Conclusion</u>**

For the reasons stated herein, the Court grants in part and denies in part Victory's motion

for summary judgment [324] and denies ADTR's motion for partial summary judgment [327].

**IT IS SO ORDERED.**                    **ENTERED   3/31/16**

_____
**John Z. Lee**
**United States District Judge**