# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| JOSHUA WOODARD, NEIL WESTFALL, ALEX SHELNUTT, JEREMY MCKINNON, all professionally known as A DAY TO REMEMBER, | ) ) ) ) ) | |
| Plaintiffs/Counter-Defendants, | ) ) | 11 C 7594 |
| v. | ) ) | Judge John Z. Lee |
| VICTORY RECORDS, INC., AND ANOTHER VICTORY, INC., | ) ) ) | |
| Defendants/Counter-Plaintiffs. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Joshua Woordard, Neil Westfall, Alex Shelnutt, and Jeremy McKinnon are members of the band A Day to Remember ("ADTR"). ADTR seeks declaratory judgment that they have performed their obligations under a recording agreement with Defendant Victory Records, Inc., and that they own the copyrights related to songs recorded pursuant to the agreement. In addition, ADTR brings claims for breach of contract, accounting, violation of the Tennessee Consumer Protection Act, violation of the Illinois Consumer Fraud Act, and violation of the Illinois Right of Publicity Act and the Lanham Act. Defendants Victory Records and Another Victory, Inc., brought a counterclaim seeking declaratory judgment on the same issues as Plaintiffs and asserting claims for breach of contract.

In anticipation of trial, each side has offered two expert witnesses: ADTR has offered Jeffrey Light and Wayne Coleman; Victory has offered Jeffrey Levy and Bruce Kolbrenner. For each witness, the opposing side has filed a motion *in limine* to exclude the expert. For the reasons provided below, the Court denies the motions to exclude Levy [331] and Light [317] and grants in part and denies in part the motions to exclude Coleman [314] and Kolbrenner [336].

## Legal Standard

District courts have broad discretion to rule on evidentiary issues prior to trial. *See United States v. Chambers*, 642 F.3d 588, 594 (7th Cir. 2011). Accordingly, "[a]lthough the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). A district court will only grant a motion *in limine* to exclude evidence if that evidence is clearly inadmissible for any purpose. *See Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997); *Townsend v. Benya*, 287 F. Supp. 2d 868, 872 (N.D. Ill. 2003). Furthermore, it is within a district court's discretion to adjust a ruling on a motion *in limine* as the proceedings unfold. *See Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 565 (7th Cir. 2006) (citing *Luce*, 469 U.S. at 41–42).

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's seminal case, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) ("At this point, Rule 702 has superseded *Daubert*, but the standard of review that was established for *Daubert* challenges is still appropriate."). By its terms, Rule 702 allows the admission of testimony by an expert, someone with the requisite "knowledge, skill, experience, training, or education[,]" to help the trier of fact "understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702. Experts are permitted to testify when their testimony is (1) "based upon sufficient facts or data, [(2)] the testimony is the product of reliable principles and methods; and [(3)] the expert has reliably applied the principles and methods to the facts of the case." *Id.*

*Daubert* requires the district court to act as the evidentiary gatekeeper, ensuring that Rule 702's requirements of reliability and relevance are satisfied before allowing the finder of fact to

hear the testimony of a proffered expert. *See Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999). District courts have broad discretion in determining the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) ("[W]e 'give the district court wide latitude in performing its gatekeeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable.'") (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)).

The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

## Analysis

### I. Expert testimony of Jeffrey Light

Jeffrey Light, ADTR's expert, offers four principal opinions. First, Light opines on the meaning of the term "album" based on industry practice and, as a corollary, concludes that ADTR has delivered to Victory, at a minimum, seven discrete albums. *See* Light Expert Report at 1, 3–6, Pls.' Resp. Mot. Exclude Light, Ex. 2, ECF No. 359. Light also explains that, based on the practices of the music industry, the agreement between ADTR and Victory (the "Deal Memo") did not convey any copyrights to Victory. *See id.* at 6, 7. Light also intends to opine on the appropriate royalty rate governing digital downloads and whether the band's sale of merchandise through a website was prohibited by a provision forbidding sales through a retailer. *See id.* at 6, 7–8.

In Victory's motion *in limine*, the record company argues against Light's admissibility on two grounds. First, Victory argues that Light's opinions are merely outcome-determinative legal conclusions. Second, they contend that Light's methodology is unreliable.

### A. Legal conclusions

Victory first alleges that Light's opinion regarding the definition of an album is an improper legal conclusion. *See* Defs.' Mot. Exclude Light at 11, ECF No. 317. Expert witnesses may not testify as to outcome-determinative legal conclusions. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). The fact that Light's definition of an album results in ADTR having delivered on the contract, however, does not render his opinions deficient.

The term "Album" as used in the Deal Memo is ambiguous, and thus, extrinsic evidence helpful in curing the ambiguity is admissible. *See Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 543 (7th Cir. 2000). Light's testimony attempts to do just that by providing a working definition of the term as it is commonly used in the music industry. *See* Light Expert Report at 5 ("The bottom line is that a full-length set of live recordings is unquestionably an album as the term is commonly used in the music industry . . . ."). Thus, his report is not merely an outcome-determinative legal conclusion, but the type of industry custom testimony that could help a jury interpret the ambiguous term. *See WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994) ("Evidence of custom and usage is relevant to the interpretation of ambiguous language in a contract.").

Victory also challenges Light's opinion regarding digital downloads as an impermissible legal conclusion. *See* Defs.' Mot. Exclude Light at 11–12. But, as explained in the Court's order on summary judgment, because Plaintiffs' claim that they were entitled to a greater royalty for digital downloads of their works was not raised in their amended complaint, Light's testimony regarding this issue is excluded.

### B. Methodology

Next, Victory challenges Light's methodology for determining what an album is. *See* Defs.' Mot. Exclude Light at 12–15. Victory first argues that, instead of explaining any methodology for how he arrived at his opinion, Light impermissibly relies only on his experience. *See id.* at 12–13. But experts are permitted to rely upon their extensive experience in a particular field as a basis for their opinions. *See Kumho Tire Co.*, 526 U.S. at 148; *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) ("Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness.").

Victory also argues that Light's methodology is flawed because he relies on the "plain meaning rule" to support his definition of the term "album." *See* Defs.' Mot. Exclude Light at 13–14 (citing Light Dep. at 112:12–14, Pls.' Resp. Mot. Exclude Light, Ex. 3 ("And under the so-called plain meaning rule, I think that these are definitely albums.")). Although at times Light appears to draw legal conclusions, there is enough in his report and deposition to show that his opinion is based primarily on his experience with industry custom, and his testimony will be limited to this extent. *See* Light Expert Report at 5 ("[T]he phrase 'album' covers a lot of territory in the music industry."); Light Dep. at 100:12–14 (explaining that his definition of an album in the report is a "general statement about industry practice").

Victory also seeks to exclude Light's opinion regarding what copyright interests, if any, were transferred to Victory vis-a-vis the Deal Memo. The Court has granted Victory's motion for summary judgment on the issue of copyrights in the recordings, so arguments related to those rights are moot. As to the publishing rights, Light notes in his report that he reviewed contracts transferring publishing rights and concludes that in general they specify what percentage of the

5

rights the publisher is acquiring. *See* Light Expert Report at 7. Although he notes that he is unable to determine what the parties intended, his testimony would be relevant to resolving the ambiguity that exists in the contract as to whether the Deal Memo transfers any publishing rights at all.

Accordingly, the Court denies Victory's motion *in limine* to exclude Light's testimony and report to the extent discussed above.

## II. Expert testimony of Jeffrey Levy

Like Light, Victory's expert, Jeffrey Levy, opines as to the meaning of the term "album" based on its common usage in the music industry. Unlike Light, however, Levy concludes that, under his definition, ADTR has delivered only three distinct albums. *See* Levy Expert Report at 3, Pls.' Mem. Supp. Mot. Exclude Levy, Ex. 1, ECF No. 332. Levy also will testify that the Deal Memo gave Victory perpetual rights to distribute of all recordings created pursuant to the agreement. *See id.* ADTR challenges the admissibility of these opinions.

With regard to the definition of the term "album," ADTR essentially argues that Levy admitted that there could be outliers to his industry definition of the term, but failed to consider whether Victory was such an outlier by, for example, considering how Victory defined the term in other recording contracts. *See* Pls.' Mem. Supp. Mot. Exclude Levy at 5–9. Levy's role as an expert witness, however, is to help the jury understand how the term "album" is typically defined in the industry. Certainly, how Victory itself may have defined the term in other contracts may be relevant to Levy's inquiry, but his failure to consider this data goes to the weight of Levy's testimony, not its admissibility. *See Lees v. Carthage College*, 714 F.3d 516, 526 (7th Cir. 2013); *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000).[1]

---

[1] If Victory has an idiosyncratic definition of what an album is, and that definition was part of the negotiations with ADTR, then that evidence would be useful to explain the negotiations between the

With regard to Levy's opinion regarding the distribution rights transferred to Victory under the Deal Memo, the Court has granted summary judgment to Victory as to this issue. Thus, this portion of ADTR's motion is moot.

In sum, ADTR's motion *in limine* to exclude Levy's testimony is denied as discussed.

### III.  Expert testimony of Bruce Kolbrenner

ADTR also seeks to exclude certain testimony by Victory's damages expert, Bruce Kolbrenner. *See* Pls.' Mem. Supp. Mot. Exclude Kolbrenner at 1, ECF No. 352. Kolbrenner will testify about the amount of profits Victory lost when ADTR self-released its record, *Common Courtesy*. *See* Kolbrenner Expert Report at 12–28, Pls.' Mem. Supp. Mot. Exclude Kolbrenner, Ex. 3. In order to arrive at his conclusions, Kolbrenner makes various assumptions about ADTR's previous albums. *See id.* at 6–8. Kolbrenner also opines as to the profits Victory lost from its inability to sell merchandise allegedly caused by the band's refusal to approve any new designs. *See id.* at 29–31.

In seeking to exclude Kolbrenner, the band first argues that Victory has not turned over documents on which Kolbrenner relied in arriving at his conclusions. *See* Pls.' Mem. Supp. Mot. Exclude Kolbrenner at 5–10. Next, ADTR contends that Kolbrenner's conclusions about the band's third album, *What Separates Me From You*, are based on unsupported assumptions. *See id.* at 11–14. Third, ADTR argues that Kolbrenner's opinion regarding *Common Courtesy*, the band's self-released album, is unsupported entirely. *See id.* at 14–17. Finally, the band challenges Kolbrenner's methodology in calculating lost profits from merchandise sales. *See id.* at 17–20.[2]

---

parties. *See Sunstream Jet Express, Inc. v. Int'l Air Service Co.*, 734 F.2d 1258, 1269 n.8 (7th Cir. 1984). But as explained above, Levy's testimony relates to the industry practice, which is distinct from the question of whether Victory had its own unique definition of the term.

[2]  In a May 26, 2015, order, the Court set a strict limit on the number of pages for *Daubert* briefs, limiting opening briefs and response briefs to twenty pages and reply briefs to ten pages. Although the

### A. Sufficiency of Victory's Document Production

To begin with, ADTR accuses Victory of failing to produce documents upon which Kolbrenner allegedly relied to arrive at his opinions. Specifically, ADTR argues that Victory failed to produce a document called the General Ledger Detail Report showing Victory's income from all of the band's records. *See id.* at 6. Victory, on the other hand, argues that such a report was never created and that all relevant documents were produced. *See* Defs.' Opp'n Mot. Exclude Kolbrenner at 6–7, ECF No. 371.

In his report, Kolbrenner includes a list of documents that he considered in arriving at his conclusions. *See* Kolbrenner Expert Report at 3–5. That list includes two General Ledger Detail Reports from Victory, but both pertain to the expenses relating to ADTR's albums, and both were provided to ADTR during discovery. *See* Kolbrenner Expert Report at 4; Discovery Summary at 3, Meloni Decl., Ex. A, ECF No. 373 (showing that General Ledger Detail Reports relating to expenses were turned over on April 25, 2014). In addition to the documents listed in the report, there appears to be another document (exhibit 2 from Kolbrenner's deposition titled "Document showing sales and returns by territory for individual albums") that Kolbrenner used to obtain data regarding the physical sales and returns of the albums. *See* Kolbrenner Dep. at 40:23–41:23, Pls.' Mem. Supp. Mot. Exclude Kolbrenner, Ex. 5.

Although ADTR cites to various excerpts from Kolbrenner's deposition to support its arguments, none clearly show that Kolbrenner relied on a document that was not produced in discovery. First, ADTR claims that Kolbrenner's report "unambiguously" admits as much. *See*

---

body of Defendants' response brief fell within the page limit, it attached a declaration by counsel, Robert Meloni, consisting largely of additional factual and legal arguments. Such blatant machinations to obviate this Court's orders will not be tolerated, and Mr. Meloni's declaration will not be considered by the Court. Similarly, Mr. Meloni's 32-page declaration submitted in support of Defendants' motion to exclude Wayne Coleman also will be disregarded. Future attempts such as this to circumvent orders of the Court will be met with significant sanctions against the offending parties and their counsel.

Pls.' Reply Mot. Exclude Kolbrenner at 1–2 & n.2, ECF No. 387. But this is simply false. According to the report, Kolbrenner reviewed "various Revenue Summaries and General Ledger Detail Reports to determine the amount of income associated with Physical and Digital Revenue." Kolbrenner Expert Report at 13–14. The most natural reading is that Kolbrenner relied on the expense reports—which were produced to ADTR—to arrive at the income figures by subtracting the expenses from the revenue.

Next, ADTR highlights various portions of Kolbrenner's deposition, which it claims show that he relied upon a General Ledger Detail Report for income data. *See* Pls.' Mem. Supp. Mot. Exclude Kolbrenner at 6 (citing Ex. 5, Kolbrenner Dep. at 39:6–11; 45:20–46:2; 46:6–17; 46:21–47:6). This too is false. In fact, not one of the four cited passages indicates that Kolbrenner relied on such a report. To take just one example, ADTR points to the following exchange on pages 45 and 46 of the deposition:

> Q: . . . And how about the line for license -- license income? Do you recall where those numbers came from?
>
> A: I'm pretty sure it came from the GL detail report.
>
> Q: So that would have been a GL detail report for licensing income?
>
> A: I'm pretty sure, yes.

Kolbrenner Dep. at 45:20–46:2. But the licensing income report referenced in that conversation was produced to ADTR on June 1, 2012. *See* Discovery Summary at 1. Simply put, ADTR has not established that Kolbrenner relied upon a document that was not produced.

### B. Kolbrenner's Opinion About *What Separates Me From You*

In calculating the potential lost profits from *Common Courtesy*, Kolbrenner used as a comparator the band's second album, *Homesick*, rather than the third, *What Separates Me From You*. In his view, the third album provides a less dependable comparison because it could have

been more successful than it actually was. He arrives at this conclusion based, in large part, on six assumptions supplied by Victory, all of which apparently contributed to the third album's deflated sales: (1) the lack of communication between ADTR and Victory prior to the album's release; (2) the lack of bonus content to boost long term marketing of the album; (3) ADTR's decision not to release the second promotional video for the song "2nd Sucks," a song on the album; (4) the relatively short amount of time ADTR had to produce the album; (5) the lack of cooperation between ADTR and Victory in marketing the album; and (6) the timing of the album's release. *See* Kolbrenner Expert Report at 6.

Claiming that these assumptions are unsupported by the record, ADTR asks the Court to exclude Kolbrenner's testimony entirely. But "[t]he reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013). Here, ADTR challenges the soundness of the expert's assumptions, not his methodology. This is true even when the information comes from Victory itself. *See Tuf Racing Prods.*, 223 F.3d at 591.

That said, it is worth noting that an expert offering an opinion under Rule 702 may rely upon either admissible evidence or inadmissible facts or data, but in the latter instance, only "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. What is more, if the facts or data upon which the expert relies are inadmissible, they may be disclosed to the jury "only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id.*

Here, neither Victory nor Kolbrenner contends that the assumptions at issue are the kinds of assumptions upon which experts reasonably rely. Rather, they both argue that Kolbrenner's opinions should not be excluded at this point, because Victory will provide admissible evidence

to prove these assumptions at trial. *See* Kolbrenner 7/14/15 Decl. ¶¶ 5, 31–32, ECF No. 372; Defs.' Opp'n Mot. Exclude Kolbrenner at 9. Accordingly, based upon these representations, the Court holds that Kolbrenner may rely upon the assumptions set forth on pages 6 and 7 of his report as grounds for his opinions, but only if Victory can establish them through admissible evidence at trial.

Practically speaking, this means that Victory must offer admissible evidence at trial that "the 11/16/2010 release of *What Separates Me From You* and subsequent sales of that album were not as successful as they could have been considering the tremendous success that the Band's previous album entitled *Homesick* obtained" for the reasons set forth in Kolbrenner's report. *See* Kolbrenner Expert Report at 6. Presumably, Victory will attempt to present this evidence through its CEO, Anthony Brummel, under Rule 701, but whether it will be able to lay the requisite foundation for such testimony remains to be seen.

ADTR also challenges Kolbrenner's failure to consider alternate explanations for why the third album did not perform as well as it could have. *See* Pls.' Mem. Supp. Mot. Exclude Kolbrenner at 12–14. For instance, the decline in sales of the third album could also be explained, according to ADTR, by the decline in record sales in the music industry at large. These arguments, like those presented about the assumptions Kolbrenner used, are better left for cross-examination. *See Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000) ("The possibility of Mr. Cooper's CPS being attributable to a factor other than the fall is a subject quite susceptible to exploration on cross-examination by opposing counsel. . . . Nelson's contention that other conditions of Mr. Cooper's might have caused his CPS goes to the weight of the medical testimony, not its admissibility.").

### C. Kolbrenner's Opinion About *Common Courtesy*

After the relationship between the band and Victory had soured—in fact, after this suit was filed—ADTR self-released a new album, *Common Courtesy*. Kolbrenner's analysis for the lost profit from the fourth album differed from the actual sales of this self-released album. In his report, Kolbrenner explained that he was working from the assumption that Victory would have done a better job of marketing and promoting the album, thus leading to higher sales. *See* Kolbrenner Expert Report at 6.

ADTR once again challenges many of the assumptions that Kolbrenner used in reaching the conclusion that, had *Common Courtesy* been released with Victory, it would have sold better. *See* Pls.' Mem. Supp. Mot. Exclude Kolbrenner at 14–16. For the same reasons explained above, the Court finds that these arguments go to the weight of the evidence and are better addressed on cross-examination before the jury. Similarly, Victory must offer admissible evidence at trial that "the manner in which ADTR self-released, marketed and promoted *Common Courtesy*, as compared to the release of that same album by Victory, had it been delivered to Victory, resulted in diminished sales of the self-released album" for the reasons contained in Kolbrenner's report. *See* Kolbrenner Expert Report at 6–7.

### D. Kolbrenner's Reliance Upon Certain Sales Figures

ADTR's next challenge to Kolbrenner's opinion deals with his calculation of the sales figures for the band's various albums. Kolbrenner attempts to show that the ADTR albums released by Victory perform better. In doing so, he cites to two sets of numbers. The first, contained in Exhibit D to the report, shows the total sales of the three albums Victory released, as well as the total sales for *Common Courtesy*. *See* Kolbrenner Expert Report at 28 (showing that as of January 2015 album 1 sold 254,902 units, album 2 sold 424,975 units, album 3 sold

359,023 units, and the self-released album sold 239,348 units). The problem with these numbers is that the albums have been out for different periods of time. As of January 2015, *Common Courtesy* had been out for just over a year, while the second album had been out for almost six years. *See id.*

In order to provide a better comparison, Kolbrenner also attempts to analyze the first 58 weeks following the release of each album to show how each album had performed after roughly a year of sales. The report states: "The cumulative 58 week total for both *What Separates Me From You*[, the third album,] (359,555) and *Homesick*[, the second album,] (425,670) are far greater than sales of *Common Courtesy* (240,173)." *See id.* at 13. The citation the follows that sentence is to an exhibit attached to the report that lists the albums sold during each of the first 58 weeks from the debut of each album. *See id.* Ex. 34. After the 58th week, the exhibit has a row titled "RTD Cumulative." The numbers in that row show the total sales for each album since its release (424,975 for the second album, 359,023 for the third album, and 239,438 for *Common Courtesy*), and does not give a total for the 58 weeks of sales that are presented in the preceding rows. *Id.*

Thus, the numbers that Kolbrenner cites in his report on page 13 are for the cumulative sales of each album—from the album's debut until January 2015—not for the first 58 weeks of each album. ADTR's damages expert, Wayne Coleman, in fact illuminates this point in his rebuttal report. The true 58 week totals show that *Common Courtesy*'s first year was better than the second album's first year. *See* Coleman Resp. Report at 6–7, Pls.' Mem. Supp. Mot. Exclude Kolbrenner, Ex. 4 (showing that the second album sold 177,155 units in its first 58 weeks, the third album sold 256,322 units in its first 58 weeks, and *Common Courtesy* sold 238,490 units in

its first 58 weeks). Kolbrenner's data error, however, is more properly addressed by cross-examination at trial and does not require his exclusion at this time.

Kolbrenner's response to the rebuttal is a different matter. Following Coleman's rebuttal report, Kolbrenner has had two opportunities to address this issue. First, in his deposition, Kolbrenner claimed that Coleman misunderstood the report as it related to exhibit 34. *See* Kolbrenner Dep. at 103:19–104:4. What he was trying to show, Kolbrenner explained, was the "longevity of an album," which he says could be shown by "look[ing] at the decline in sales" of *Common Courtesy* as compared to the second and third album. Kolbrenner Dep. at 103:19–104:4. More recently, Kolbrenner again argued that Coleman misunderstood his report and that he was attempting to show the "relative sales trends" of the three albums. Kolbrenner 7/14/15 Decl. ¶ 40. But Kolbrenner never ran the type of rate-of-change analysis for which he purports to have used exhibit 34, or if he did perform such an analysis, he never disclosed it in his expert report. Accordingly, Kolbrenner is excluded from testifying that his opinions as to the expected sales of *Common Courtesy* were based upon rate-of-change figures or sales longevity data.

### E.     Kolbrenner's Methodology for Lost Profits from Merchandise

Finally, ADTR attacks Kolbrenner's method for calculating the profits Victory allegedly lost from merchandise sales. To perform this analysis, Kolbrenner relied upon the revenue and related expenses for a period prior to the alleged breach. According to ADTR, Kolbrenner's methodology is flawed because the revenue numbers he used cover a period of 21 fiscal quarters, while the expense numbers covered only 11 fiscal quarters. *See* Pls.' Mem. Supp. Mot. Exclude Kolbrenner at 18–19. This, ADTR argues, is like comparing apples to oranges and evinces flawed methodology. In response, Kolbrenner explained in his deposition that he did not think the revenue for the additional 10 quarters warranted an adjustment. *See* Kolbrenner Dep. at

126:10–12, 334. To the extent that ADTR disagrees with Kolbrenner's selection of data points, ADTR is free to challenge them during cross-examination.

For the reasons stated in this section, ADTR's motion *in limine* to exclude certain testimony by Bruce Kolbrenner is granted in part and denied in part. Kolbrenner is excluded from discussing the sales longevity or the rate at which sales were changing in connection to *Common Courtesy*. In all other respects, the motion is denied.

## IV. Expert testimony of Wayne Coleman

ADTR retained Wayne Coleman as a damages expert. In his expert report, Coleman summarized the money allegedly owed to the band arising from Victory's refusal to credit ADTR with more than three albums, as well as other ways in which Victory allegedly failed to fully compensation the band. *See* Coleman Expert Report at 3–11, Pls.' Resp. Mot. Exclude Coleman, Ex. 2, ECF No. 365.

Victory seeks to exclude certain opinions contained in Coleman's report. *See* Defs.' Mot. Exclude Coleman at 1, ECF No. 314. First, Victory challenges Coleman's opinions as to the number of albums delivered by ADTR and the copyrights in the compositions. *See id.* at 7–12. Next, Victory contends that Coleman's damages methodology is improper. *See id.* at 12–15. Finally, Victory seeks to exclude Coleman's testimony regarding the condition of Victory's business records. *See id.* at 15–17.

### A. Coleman's Opinions about the Albums and Copyrights

Coleman's report opines that ADTR has released 13 albums pursuant to the Deal Memo. *See* Coleman Expert Report at 3. To the extent that the report explains the methodology used at arriving at that number, it first gives the definition as set out in the Deal Memo and then says that there are 13 distinct creations that "qualify as an album under the definition." *Id.* Victory seeks to

exclude Coleman's opinion on the basis that it is an improper legal conclusion and that Coleman does not give any foundation for the conclusion. *See* Defs.' Mot. Exclude Coleman at 7–12.

The interpretation of the term "album" is a central question in this litigation. Unlike Light and Levy, Coleman does not provide any information regarding industry practice or common usage. Instead, his report offers a bald legal conclusion based solely on the language of the Deal Memo itself—language that the Court has found to be ambiguous as a matter of law. As such, the Court excludes Coleman's testimony to the extent that he seeks to opine that ADTR has provided Victory with a certain number of albums as defined in the Deal Memo.[3] *See RLJCS Enters., Inc. v. Prof'l Benefit Tr. Multiple Emp'r Welfare Benefit Plan & Tr.*, 487 F.3d 494, 498 (7th Cir. 2007) (excluding an expert's opinion because it consisted of the type of legal arguments that belong in a brief rather than in an expert's report).

Victory also challenges Coleman's opinion that ADTR owns 100% of the publishing rights in this works. *See* Defs.' Mot. Exclude Coleman at 8; Coleman Expert Report at 9. Here too, Coleman gives no explanation for his opinion that "ADTR retains 100% of the publishing" rights. Thus, the Court excludes Coleman's testimony in this regard.

### B. Coleman's Methodology

Next, Victory challenges the methodology Coleman used to determine how much Victory was obligated to pay ADTR for royalties from streaming services for the period from 2007 to 2013. *See* Coleman Decl. ¶ 27, Pls.' Resp. Mot. Exclude Coleman, Ex. 3. To perform this analysis, Coleman first determined what portion of the total "digital royalties" for the years 2007 through 2013 were made in 2012. *See* Coleman Expert Report, Ex. B-1. By dividing the total digital royalties from 2007 through 2013 ($684,477) by the digital royalties for 2012 ($186,428),

---

[3] To the extent that Coleman's damages opinions depend upon the number of "albums" released by the band, he may provide testimony as to the amount of damages, but such testimony must be based on the assumption that the works at issue, in fact, will qualify as "albums" under the Deal Memo.

Coleman calculated what he called the "extrapolation factor"—3.6715. *See id.*, Sch. 10B. Then, using a nonstatistical sampling method, Coleman calculated the royalties that the band earned for streaming services in 2012 and multiplied that figure by 3.6715 in order to estimate the total royalties from streaming services for the period from 2007 through 2013. According to Victory, Coleman does not have the required experience or knowledge to perform this calculation. *See* Defs.' Mot. Exclude Coleman at 12–15. This is incorrect.

Victory relies heavily on *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 384 (S.D.N.Y. 2014), where the district court excluded Coleman for lacking the necessary expertise for his opinions. But Coleman's opinions in *Faulkner* were based largely upon a mathematical interpolation model designed by another expert, and Coleman did not have the necessary knowledge in the field to opine as to the model's validity. In contrast, here, Coleman simply calculated a mathematical ratio between total 2007-2013 digital revenue, on the one hand, and 2013 digital revenue on the other, and applied that ratio to the streaming royalties in 2012 to estimate the total streaming royalties for 2007-2013. Given his background, Coleman certainly has the expertise to perform such a rudimentary calculation.[4]

### C. Coleman's Opinion on Victory's Record Keeping

Coleman concludes his report with the following:

> Victory has not maintained or provided information in an industry acceptable manner. Because of the manner in which Victory has apparently intentionally not maintained records to document their exploitation of ADTR compositions, it is necessary to reconstruct these activities by conducting deeper analyses of other source documents.

---

[4] In addition, Victory appears to challenge the sampling Coleman performed of 2012 streaming royalty data. *See* Defs.' Mot. Exclude Coleman at 14 (citing *Farmer v. DirectSat USA, LLC*, No. 08-cv-3962, 2013 WL 1195651 (N.D. Ill. Mar. 22, 2013)). But Defendants' briefs leave this argument woefully undeveloped. In any event, Coleman states that he complied with AU Section 350, entitled "Audit Sampling," which is widely recognized in the field of accounting and permits nonstatistical sampling under certain conditions. Victory claims that the document "speaks for itself," but offers no argument as to why Coleman's methodology is deficient.

Coleman Expert Report at 11. Victory argues that Coleman has no foundation for making this statement about Victory's record keeping. *See* Defs.' Mot. Exclude Coleman at 15–17.

At this stage, the relevance of the statement in Coleman's report is entirely unclear. In order to be admissible, expert testimony first must be relevant. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). On the current record, Coleman cannot meet this hurdle. Accordingly, he is excluded from testifying that Victory did not maintain records in accordance with industry standard. The Court may revisit this issue if it becomes relevant at trial.

## Conclusion

For the reasons stated herein, the Court denies the motions to exclude Levy [331] and Light [317] and grants in part and denies in part the motions to exclude Coleman [314] and Kolbrenner [336].


**IT IS SO ORDERED.**                      ENTERED   3/31/16

                                                                  _____
                                                                  **John Z. Lee**
                                                                  **United States District Judge**